Carol **WOJCIECHOWICZ,**
et al., Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**Civil Nos. 04–1846 (RLA), 04–1856(RLA), 04–2342(RLA).**

United States District Court,
D. Puerto Rico.

Sept. 18, 2008.

PHV Franklin F. Bass, Locke Lord Bissell & Liddell, LLP, PHV Louis R. Martinez, PHV Richard Ritorto, Martinez & Ritorto PC, New York, NY, Doris Quinones–Tridas, Quinones Tridas Law Office, PSC, Jaime E. Morales–Morales, Morales–Morales Law Offices, San Juan, PR, for Plaintiffs.

Miguel A. Fernandez–Torres, United States Attorneys Office, District of Puerto Rico, San Juan, PR, PHV Henry B. Goddard, Andrew M. Eschen, U.S. Department of Justice, Washington, DC, for Defendant.

## *OPINION AND ORDER*

RAYMOND L. ACOSTA, District Judge.

The Court having presided over the non-jury trial in this case [1] hereby makes the following Findings of Fact and Conclusions of Law based on the extensive evidence presented by the parties, particularly the testimony of the multiple expert witnesses.[2]

### PROCEDURAL BACKGROUND

These three consolidated cases arise out of an aircraft crash that occurred on Janu-

---

**1.** Trial lasted from February 26, 2008, through March 12, 2008. Additionally, on April 15, 2008, the Court, accompanied by counsel for the parties and Federal Aviation Agency (FAA) representatives, carried out an on-site inspection of the San Juan Center Radar Approach Control ("CERAP") facilities.

See Minutes (docket No. 180) and FAA Site Inspection Transcript (docket No. 181).

**2.** Plaintiffs called the following expert witnesses:

—James J. Parham—Air Traffic Control Expert

ary 5, 2002, in the vicinity of the peak of El Yunque, Puerto Rico. The aircraft was owned by Alexander Leasing, LLC and flown by decedent Alexander Wojciechowicz. In addition to the pilot, four passengers were also killed in the accident. These were: (1) Katherine Wojciechowicz Angrick (pilot's daughter), (2) Mark R. Angrick (Katherine's husband), (3) Heath Gnagy (Katherine's son) and (4) Lois Angrick (Mark's mother).

Two separate wrongful death and survival damages suits were filed in New Jersey by the respective executors of the estates of Mark R. Angrick and his mother, Lois. One action was instituted against the United States and the other against Carol Wojciechowicz, as Executrix of the estate of Alexander Wojciechowicz and Alexander Leasing, LLC. Both these cases were settled between the respective parties.

Carol Wojciechowicz, as Executrix of the Estate of Alexander Wojciechowicz and Alexander Leasing, LLC, instituted Civ. No. 04–1846(RLA) seeking contribution from the United States for the settlement monies paid to the Angricks in the New Jersey proceedings.

Plaintiffs in Civ. No. 04–1856(RLA) are the surviving relatives of decedents Alexander Wojciechowicz and Katherine Wojciechowicz Angrick who demand compensation from the United States for the damages resulting for their alleged wrongful deaths.

As a result of the accident, U.S. Specialty Insurance Company was obligated to pay to its insured, Alexander Leasing, LLC, the agreed value of the destroyed aircraft pursuant to the terms of the policy in effect at the time. Through Civ. No. 04–2342(RLA) the insurer now seeks contribution from the United States for the aforementioned payment.

## FINDINGS OF FACT

### Introduction

On January 5, 2002, at approximately 2:23 p.m.[3] a twin-engine Cessna Conquest bearing registration number N441AW (hereinafter the "aircraft") crashed in the Caribbean National Forest near Rio Grande, Puerto Rico, 1.43 miles from the peak of El Yunque Mountain, at an elevation of 1561 feet (hereinafter the "accident").[4]

The aircraft was enroute from the island of Culebra, off the eastern coast of Puerto Rico, to the Luis Muñoz Marín International Airport located in Carolina, Puerto Rico and was being operated as a personal flight under 14 C.F.R. Part 91.[5]

Decedent Alexander Wojciechowicz was the pilot-in-command of N441AW.[6] On-

—William Jeffrey Edwards—Accident Reconstruction Expert
—Robert H. Wallace—Pecuniary Loss Expert Defendant called the following expert witnesses:
—Edward D. Henderson—Air Traffic Control Expert
—Bernard J. Coogan—Accident Reconstruction Expert
—Lee H. Branscome—Meteorologist
—Reginald D. Emshoff—Pecuniary Loss Expert

**3.** Hereinafter, all times related to the accident flight will be expressed in (local) Atlantic Standard Time (AST).

**4.** PTO Admitted Facts ¶ 21 (docket No. 95); NTSB Factual Report pp. 1, 1b (Plaintiffs' Exh. 48); United States' Third Supplemental Response to Plaintiffs' Third Set of Interrogatories No. 49a admitted at trial. Tr. 3/7/08, 34:17–35:14.

**5.** PTO Admitted Facts ¶¶ 2, 11 (docket No. 95); NTSB Factual Report p. 1 (Plaintiffs' Exh. 48).

**6.** PTO Admitted Facts ¶ 72(docket No. 95).

board the aircraft on the date of the accident, in addition to Alexander Wojciechowicz, were passengers Katherine N. Wojciechowicz Angrick, Alexander's daughter; Mark R. Angrick, Katherine's husband; Heath Gnagy, Katherine and Mark's minor son and Lois Angrick, Mark's mother.

Plaintiffs seek damages for the wrongful deaths of pilot Alexander Wojciechowicz and his daughter passenger Katherine N. Wojciechowicz Angrick and contribution for the settlement monies paid in a New Jersey State Court action for the deaths of passengers Mark R. Angrick and Lois Angrick, as well as for the destruction of the aircraft.

Decedent pilot, Alexander Wojciechowicz, held a Commercial Pilot Certificate.[7] He had flown the aircraft for 1,494 hours and had accumulated a total of 3,935 hours as Pilot–in–Command in various aircrafts.[8] Mr. Wojciechowicz had completed his most recent Biennial Flight Review on December 10, 2001, a few weeks prior to the accident.[9] He also held all necessary certificates and met all current requirements to operate the aircraft on January 5, 2002.[10]

The aircraft's registered owner was plaintiff Alexander Leasing LLC, a privately held limited liability corporation incorporated under the laws of the State of New Jersey.[11]

Mr. Wojciechowicz held the following ratings at the time of his death: lighter than air free balloon limited to hot air balloons with airborne heater, airplane single engine land, airplane multi-engine land and instrument airplane. Additionally, he possessed a commercial pilot certificate since 1990.[12] Further, he held a third-class medical certificate with a restriction requiring him to wear corrective lenses for near and distant vision.[13]

Mr. Wojciechowicz began visiting Puerto Rico in 1971[14] and was familiar with the Island's terrain, including the location of the mountains within the Caribbean National Forest, inasmuch as he had previously flown between San Juan and Culebra approximately 200 times.[15] During these flights, he typically flew at an altitude of 1,500 feet above Mean Sea Level ("MSL").[16] On those occasions when plaintiff Susan Wojciechowicz Caldwell flew with her father over the island of Puerto Rico, she could easily see the El Yunque mountain range through small windows in the back of the plane.[17]

The Terminal Area Chart for the area over which Mr. Wojciechowicz actually flew and intended to fly on the day of the accident depicted the terrain[18] and also provided information such as terrain fea-

---

7. PTO Admitted Facts ¶ 3 (docket No. 95).

8. PTO Admitted Facts ¶¶ 6, 7 (docket No. 95).

9. PTO Admitted Facts ¶ 5 (docket No. 95); NTSB Factual Report, p. 1a (Plaintiffs' Exh. 48).

10. PTO Admitted Facts ¶ 8 (docket No. 95).

11. PTO Admitted Facts ¶¶ 1, 55, 56 (docket No. 95).

12. PTO Admitted Facts ¶ 3 (docket No. 95); Michael T. Wojciechowicz, Tr. 2/26/08, 40:23–42:4; Edwards, Tr. 3/3/08, 119:16–120:10.

13. PTO Admitted Facts ¶¶ 4, 77 (docket No. 95).

14. Michael T. Wojciechowicz, Tr. 2/26/08, 40:2–12.

15. PTO Admitted Facts ¶ 73 (docket No. 95).

16. PTO Admitted Facts ¶ 74 (docket No. 95); Edwards, Tr. 3/3/08, 168:18–169:17; 171:15–172:6.

17. Susan W. Caldwell, Tr. 2/26/08, 118:7–19.

18. Edwards, Tr. 3/3/08, 178:10–179:4.

tures, obstacles, and the Maximum Elevation Figures (MEF) [19] for all areas of his intended flight.[20]

Although Mr. Wojciechowicz was rated for flight under Instrument Flight Rules (IFR),[21] he chose to fly under Visual Flight Rules (VFR) on the accident flight. Mr. Wojciechowicz did not file an IFR flight plan prior to departing Culebra Airport, or at any time subsequent thereto. Nor did he request clearance from Air Traffic Control to fly under IFR during the accident flight.[22]

### The Accident Flight

N441AW departed the Culebra Airport at approximately 2:00 p.m. on January 5, 2002, with the Luis Muñoz Marín International Airport (hereinafter "SJU" or "San Juan Airport") as its final destination.[23] The island of Culebra is approximately 18 nautical miles east of the east coast of Puerto Rico. The purpose of the flight was to transport four members of Mr. Wojciechowicz's family from Culebra to the San Juan Airport, where they planned to catch flights to the mainland United States on commercial airliners departing from SJU. Mr. Wojciechowicz intended to return to Culebra after dropping off the passengers at SJU.[24]

Mrs. Wojciechowicz, who watched N441AW depart Culebra Airport, believed that there was no sense of urgency with respect to the flight because it was a very short trip—which she estimated at 20 minutes-and which Mr. Wojciechowicz had flown numerous times over the years for the same purpose.[25]

Mr. Wojciechowicz contacted the San Juan CERAP East Control position at 2:18:00 p.m. that is, approximately 18 minutes after departing the Culebra Airport, from a location approximately ten miles east of Fajardo and twelve miles west of the Culebra Airport.[26] Upon contact, the aircraft was flying at approximately 190 knots, or about three miles a minute.[27] No evidence was offered during trial as to the aircraft's path during the 18 minutes which elapsed between its departure from Culebra and a point only 12 miles from Culebra Airport.

At 2:18:30 p.m. Mr. Santiago, the air traffic controller assigned to the San Juan CERAP East Control position, directed Mr. Wojciechowicz to "squawk" [28] 0477 in the aircraft's radar transponder.[29] The first radar information from N441AW was recorded at 2:18:52, when the St. Thomas radar ("STT") detected the aircraft climbing through 1,100 feet above mean sea

---

19. The MEF is the altitude at any given location at which a pilot is assured that he or she will not risk colliding with any obstruction or terrain features if flight is at or above the specified MEF. Edwards, Tr. 3/3/08, 175:7–22.

20. Edwards, Tr. 3/3/08, 175:7–22.

21. Edwards, Tr. 3/3/08, 119:16–120:10.

22. PTO Admitted Facts ¶ 66 (docket No. 95); Edwards, Tr. 3/3/08, 190:3–8.

23. PTO Admitted Facts ¶ 11 (docket No. 95).

24. NTSB Factual Report PDF p. 22 (Plaintiffs' Exh. 48).

25. NTSB Factual Report PDF p. 22 (Plaintiffs' Exh. 48).

26. Marcos Santiago ("Santiago"), Tr. 2/26/08, 190:1–192:25; Full Transcript of Aircraft Accident (Joint Exh. III p. 5).

27. NTSB Factual Report "CDR Data" (Plaintiffs' Exh. 48) PDF p. 124.

28. Radio transmission of the transponder onboard an aircraft. Also, an air traffic controller's instruction to a pilot to set one of 4,096 possible codes to identify the aircraft on the controller's radar.

29. Santiago, Tr. 2/26/08, 201:5–21; Full Transcript of Aircraft Accident (Joint Exh. III) p. 6.

level ("MSL") at a speed of 190 knots.[30] At 2:19:54 p.m., Mr. Santiago established radar contact with N441AW at a point three miles east of the Fajardo Airport.[31] In response to Mr. Wojciechowicz's stated desire to land at the San Juan Airport, Mr. Santiago instructed N441AW to enter a right downwind for Runway 10 south of Plaza Carolina.[32] The controller provided Mr. Wojciechowicz with the current weather for the San Juan Airport and requested the pilot to state his altitude.[33] The pilot replied that he was at 1,600 feet MSL and that he would stay south at Plaza Carolina.[34] The speed of N441AW continued to increase to as fast as 218 knots as the aircraft traveled westward.[35]

As the aircraft traveled westward, its altitude above the ground ("AGL") decreased as the aircraft maintained a more-or-less constant altitude above mean sea level while the elevation of the terrain along its flight path increased. At approximately 2:21:18, about one minute prior to the crash, N441AW was at 600 feet AGL.[36] Successive radar data, plotted on a map showing terrain elevation, portray the aircraft's altitude above the ground rising and falling as it crossed over the rugged terrain. The separation between the aircraft and the ground increased to 778 feet AGL, then decreased to 616 feet AGL, then decreased further to 352 feet AGL, then 317 feet AGL, then increased to 580 feet. Approximately 30 seconds, or one and one-half miles before the crash, the aircraft was being flown as low as 150 feet above the ground, not including the height of the trees.[37] From that point to the crash, the altitude above the ground increased again to as high as 711 feet AGL as the aircraft crossed a valley, with the last radar data preceding the crash indicating an altitude of 366 feet AGL as the terrain rose again.[38] This above ground

---

30. NTSB Factual Report "CDR Data" (Plaintiffs' Exh. 48) PDF p. 124.

31. Santiago, Tr. 2/26/08, 212:20–213:22; Full Transcript of Aircraft Accident (Joint Exh. III) p. 7.

32. Santiago, Tr. 2/26/08, 212:20–213:22; Full Accident (Joint Exh. III) p. 7.

33. Santiago, Tr. 2/26/08, 212:20–213:22; Full Accident (Joint Exh. III) p. 7.

34. Transcript of Aircraft Transcript of Aircraft Aircraft

35. Edwards, Tr. 3/3/08, 220:8–18.

36. Bernard J. Coogan ("Coogan") Tr. 3/7/08, 133:4–21. The court finds that Mr. Coogan performed a credible and detailed investigation into the accident and credits his expert opinions concerning pilots' responsibilities when flying under VFR. Mr. Coogan has been flying continuously since 1948 and has logged approximately 28,000 hours in over 70 different civilian aircraft and 25 military aircraft. He has also been a flight examiner and is a current Certified flight Instructor. Coogan, Tr. 7/7/08, 74:21–76:22. He has testified as

an expert witness on piloting issues in approximately 100 cases. The Court rejects plaintiffs' attempt to impeach this witness by alleging that Mr. Coogan—who is also a licenced attorney—committed perjury by stating in a declaration back in 1993 that he had logged 9,700 hours as a military pilot. The available military records indicate that, in fact, Mr. Coogan logged in excess of 9,700 hours as a military pilot. Coogan, Tr. 3/10/08, 129:11–17. Further, Mr. Coogan's testimony that he prepared the sworn statement based on memory after the loss of his primary military flying records and 13 years after his retirement from military service, was not challenged or impeached in any manner. Coogan, Tr. 3/10/08, 127:15–128:2. The Court ascribes any discrepancy between the hours for individual type aircraft listed in Mr. Coogan's 1993 declaration and the hours stated in the available military records to be likely due to faulty memory. Further, with Mr. Coogan's extensive experience, which was properly documented, the Court can fathom no motive for him to falsify his record.

37. Edwards, Tr. 3/3/08, 185:1–5.

38. Coogan, Tr. 3/7/08, 134:7–11.

level altitude information[39] was not available to the air traffic controller, whose radar only displayed altitude of the aircraft above mean sea level.[40]

The aircraft collided with the ground in an area of rising terrain west of Road 191 near the La Muralla Restaurant in the Caribbean National Forest near coordinates 18°19'21"N/65°46'10"W at an elevation of approximately 1,561 feet.[41] The terrain along the extended flight path of the aircraft continued to rise to about 2,300 feet just west of the crash site along the projected flight path.[42] The crash site was 1.43 miles northeast of the peak of El Yunque, which was passing to the left of the aircraft.[43]

Despite the fact that N441AW was equipped with various types of avionics equipment that afforded the pilot precise information about the location and altitude of the aircraft during this flight, at no time during the accident flight did Mr. Wojciechowicz communicate to the controller that he was unable to provide his own separation from terrain.[44] Nor did he advise Mr. Santiago that he was lost, having any problems controlling the aircraft, or that he needed assistance in finding his location.[45]

Neither did Mr. Wojciechowicz advise the controller that he was uncertain on how to get to Plaza Carolina or had problems regarding the traffic pattern entry point for Runway 10 south of Plaza Carolina. To the contrary, the pilot's transmissions indicate that he was familiar with the area including Plaza Carolina as well as the traffic pattern for Runway 10.[46]

The Court finds Mr. Edwards' opinion to the effect that Mr. Wojciechowicz must not have known exactly where he was because, had he known, he would not have been there, speculative.[47] This testimony is also at odds with the pilot's apparent certainty about his position when he checked in with East Control ("ten miles east of Fajardo") and the confirmation of his position by the East Control air traffic controller just minutes before the accident ("[R]adar contact three miles east of Fajardo").[48] At both those points, the aircraft was in clear air below clouds with at least 10 miles visibility, with the north coast of Puerto Rico visible to the pilot.[49]

**39.** The AGL altitude data was derived by using MSL altitude data from the St. Thomas radar sensor compared to the MSL elevation of the terrain underneath N441AW during its flight. Altitude data from the St. Thomas radar sensor was used because it provided more information on the aircraft's flight path than any other available sensor. However, as further discussed below, according to the evidence in the case at that time the air traffic controller was monitoring the San Juan radar sensor, not the St. Thomas sensor, so this information was not available to him.

**40.** Santiago, Tr. 2/26/08, 205:6–206:4.

**41.** PTO Admitted Facts (docket No. 95) ¶¶ 20, 21.

**42.** Lee H. Branscome, Ph.D. ("Branscome"), Tr. 3/5/08, 178:10–23; Coogan, Tr. 3/7/08, 163:25–164:3.

**43.** Edwards, Tr. 3/3/08, 57:8–20.

**44.** Santiago, Tr. 2/27/08, 112:6–8; Coogan, Tr. 3/10/08, 111:5–19.

**45.** Edwards, Tr. 3/3/08, 160:6–11.

**46.** Santiago, Tr. 2/27/08, 112:9–15; Edward D. Henderson ("Henderson"), Tr. 3/10/08, 237:8–23.

**47.** Edwards, Tr. 3/3/08, 160:19–161:3.

**48.** Full Transcript of Aircraft Accident(Joint Exhibit III) at times 1818:09 and 1819:54.

**49.** Branscome, Tr. 3/5/08, 195:21–196:22, 197:15–23, 205:18–206:10; 3/6/08, 84:10–20.

Mr. Wojciechowicz first entered Class G airspace [50] at 2:21:18 p.m., or approximately one minute before the collision, at about the same time that there was loss of radar contact.[51] He flew in and out of Class G airspace from 2:21:18 p.m. until the accident.[52] The pilot flew in Class G airspace for at least the 10 seconds prior to colliding with the terrain.[53]

**The Pilot–in–Command of Aircraft Flying Under Visual Flight Rules Chose the Aircraft's Course, Speed, and Altitude Without Direction From Air Traffic Control**

Piloting under VFR, Mr. Wojciechowicz was free to fly any route of his choice, even after contacting air traffic control. He was able to do so without the need to inform the controller of his intentions at any given moment.[54]

At no time during the accident flight did the controller provide Mr. Wojciechowicz with a "vector" (an assigned heading), nor did Mr. Wojciechowicz ask the controller for one.[55]

Even though the pilot was directed to enter the right downwind south of Plaza Carolina, when it came time for Mr. Wo-jciechowicz to enter the airport traffic pattern at SJU, he was given no instructions as to the particular route to take or altitude to fly.[56] He was free to choose his own desired routing to the traffic pattern entry point (Plaza Carolina), as well as any altitude at any given point.[57]

The only pertinent limitation on Mr. Wojciechowicz's ability to fly and land at the SJU airport was that he enter the traffic pattern for Runway 10 south of Plaza Carolina.[58] By instructing Mr. Wojciechowicz to enter the traffic pattern south of Plaza Carolina, the controller reasonably understood that it was within the VFR pilot's sole discretion to choose the appropriate altitude to fly because the VFR pilot is in a better position to see the clouds and terrain and to adjust the altitude accordingly.[59]

At no time during the accident flight did the controller direct the pilot to fly at any particular altitude.[60] Mr. Wojciechowicz had the full discretion to fly at any altitude of his choice.[61] As a matter of fact, he altered the altitude of N441AW several times during the accident flight without

**50.** Class G airspace (uncontrolled) is that portion of the airspace that has not been designated as Class A, Class B, Class C, Class D, or Class E airspace. Aeronautical Information Manual ¶ 3–3–1.

**51.** Edwards, Tr. 3/3/08, 197:14–200:12.

**52.** Edwards, Tr. 3/3/08, 201:23–202:3.

**53.** Edwards, Tr. 3/3/08, 196:17–20.

**54.** Santiago, Tr. 2/27/08, 109:12–110:11, 189:15–190:3; Edwards, Tr. 3/3/08, 213:7–214:2; James Gary Parham ("Parham"), Tr. 3/4/08 (PM), 68:11–69:17; Coogan, Tr. 3/7/08, 154:17:25; Henderson, Tr. 3/10/08, 237:24–238:10; 3/11/08, 145:13–15.

**55.** Santiago, Tr. 2/27/08, 109:8–11; Edwards, Tr. 3/3/08, 216:5–20; Parham, Tr. 3/4/08 (PM), 68:17–19, 103:18–20.

**56.** Santiago, Tr. 2/27/08, 108:7–109:23.

**57.** Coogan, Tr. 3/7/08, 155:22–156:3.

**58.** Santiago, Tr. 2/27/08, 108:7–109:23.

**59.** Santiago, Tr. 2/27/08, 110:17–23; 111:25–112:5.

**60.** Santiago, Tr. 2/27/08, 110:12–23; Edwards, Tr. 3/3/08, 212:8–15; Henderson, Tr. 3/10/08, 238:19–25.

**61.** Edwards, Tr. 3/3/08, 212:19–213:13; Parham, Tr. 3/4/08, 69:19–70:19 (VFR pilot can choose any altitude, but if changing should advise ATC, who cannot disapprove change); Henderson, Tr. 3/10/08, 238:19–25.

the need or requirement of seeking the controller's prior authorization to do so.[62]

Because the area where the accident occurred and the area along the aircraft's flight path leading to it were sparsely populated, Mr. Wojciechowicz had the legal right to fly as close to the ground as he desired so long as he remained at least 500 feet laterally from persons, vehicles, or structures.[63]

There is no evidence from which the Court can conclude that Mr. Wojciechowicz did anything other than consciously choose to fly the course, altitudes and airspeeds that he desired during the accident flight.

**At All Times During the Flight of N441AW, the Pilot–in–Command Was Solely Responsible for Maintaining Safe Separation Between The Aircraft and Terrain**

A VFR pilot who is receiving basic radar service (as was Mr. Wojciechowicz in this case) has the sole responsibility to avoid colliding with the terrain because he "has the best seat in the house" to see and avoid the ground.[64] Moreover, "[t]here is no one else who knows his proximity to the ground. That responsibility rests at all times with the pilot." [65] The pilot has the "minute to minute, second to second, capability and obligation to see that he is clearing the terrain." [66]

The Aeronautical Information Manual "AIM" [67] at ¶ 4–1–17 entitled "Terminal Radar Services for VFR Aircraft" specifically advises and emphasizes in uppercase letters that, although the VFR pilot may be receiving basic radar services, it is the "PILOT['S] RESPONSIBILITY" and that the provision of basic radar services is "NOT TO BE INTERPRETED AS RELIEVING PILOTS OF THEIR RESPONSIBILITIES ... TO MAINTAIN APPROPRIATE TERRAIN AND OBSTRUCTIONS CLEARANCE," and "TO REMAIN IN WEATHER CONDITIONS EQUAL TO OR BETTER THAN THE MINIMUMS REQUIRED BY 14 CFR SECTION 91.155." [68] Pilots understand that this section means that they may not abrogate their duty to maintain appropriate terrain separation.[69]

The AIM makes it clear at ¶ 4–1–17e that the responsibilities of a VFR pilot who is receiving basic radar services are no different from those of a VFR pilot who is not receiving those services. These responsibilities include the duty to maintain vigilance so as to see and avoid the terrain. The VFR pilot's primary and continuing duty to see and avoid the terrain is not diminished in any degree simply because the pilot may be in radar contact with and in radio communication with an air traffic controller.[70]

**62.** Edwards, Tr. 3/3/08, 214:5–216:4.

**63.** Edwards, Tr. 3/3/08, 196:10–20; Coogan, Tr. 3/7/08, 156:7–157:6. *See also*, 14 CFR § 91.119(c) "Minimum Safe Altitudes: General".

**64.** Coogan, Tr. 3/7/08, 152:16–153:3; 157:15–16,

**65.** Coogan, Tr. 3/7/08, 157:6–19; Coogan, 3/10/08, 61:20–62:1, 64:7–65:2.

**66.** Coogan, Tr. 3/10/08, 106:6–19.

**67.** The AIM provides to pilots, *inter alios*, standards and procedures for use in the United States National Airspace System.

**68.** AIM (Joint Exhibit II) ¶ 4–1–17e, PDF p. 213; Coogan, Tr. 3/10/08, 112:3–113:15.

**69.** Coogan, Tr. 3/10/08, 114:7–13.

**70.** Coogan, Tr. 3/7/08, 152:8–159:3. Mr. Coogan vigorously disagreed with Mr. Edwards' testimony to the effect that there are "different levels of VFR or VFR combined with IFR." Coogan, Tr. 3/7/08, 153:18–20. Mr. Coogan testified that he had never heard of such a concept. Further, he had carefully examined the AIM and found "nothing in there about that." Coogan, Tr. 3/7/08, 153:16–22. The Court fully credits Mr. Coogan's testimony in this regard.

Under the circumstances of this type of flight, the pilot would be expected to devote 90 percent of his time to looking outside the aircraft.[71] While doing so, he is identifying landmarks and features to create situational awareness.[72] This pattern of scanning outside the cockpit allows the pilot to see the terrain features.[73]

Pilots flying VFR are compelled to use the vigilance required to see and avoid terrain. Avoiding terrain is the VFR pilot's continuing responsibility and that responsibility cannot be delegated in whole or in part to air traffic control, regardless of whether or not the pilot is in communication with an air traffic control facility.[74] However, this does not relieve an ATC from issuing a safety alert if he is *aware* that the aircraft is at an *altitude* which, in the controller's judgment, places the aircraft in unsafe proximity to terrain obstructions or other aircraft.[75]

Accordingly, it is the Court's task to determine, based on the evidence presented at trial, whether given the extant circumstances at the time of the accident there was sufficient cause to trigger such an awareness on the part of Mr. Santiago.

### Pilot–in–Command Flew N441AW into a Cloud With Low Visibility, in Violation of the Federal Aviation Regulations Governing Flight Under Visual Flight Rules

Because Mr. Wojciechowicz was flying under VFR, the provisions of Federal Aviation Regulation ("FAR") 14 C.F.R. § 91.155 applied. This regulation required that he avoid clouds by certain minimum distances and to fly only in areas where the in-flight visibility met the regulatory minimums. Through the FARs and the AIM pilots are advised of the minimum visibility requirements for flight under VFR.[76] In pertinent part, the AIM provides:

(A) No person may operate an aircraft under basic VFR when the flight visibility is less, or at a distance from clouds that is less, than that prescribed for the corresponding altitude and class of airspace.

Bernard Coogan, a pilot expert with over 28,000 hours of experience as pilot-in-command, testified that "a VFR pilot has a continuing responsibility under the concept of see and avoid to avoid getting into closer, or involved with clouds below the criteria spelled out in [14 C.F.R. § 91.155], which gives [the pilot] the cloud separation and visibility requirements in all of the air spaces from [Class] A to [Class] G." [77] The pilot must "continually monitor the weather systems . . . to make sure that he flies a flight path to avoid the clouds by the criteria spelled out under the regulation." [78]

When the pilot of N441AW entered the clouds about one-half mile before impacting the ground the aircraft, as stated above, was operating in Class G airspace.[79] While in Class G airspace, Mr. Wojciechowicz was prohibited from flying into an area if the visibility was less than one mile. He was strictly prohibited from entering clouds.[80]

Dr. Lee Branscome, an expert meteorologist, investigated the weather along the

71. Edwards, Tr. 3/3/08, 192:10–19.

72. Edwards, Tr. 3/3/08, 192:22–25.

73. Edwards, Tr. 3/3/08, 193:5–9.

74. Coogan, 3/7/08, 152:16–153:3.

75. AIM ¶ 4–1–15 (italics supplied.)

76. 14 C.F.R. § 91.155; AIM ¶ 3–1–4 "Basic VFR Weather Minimums".

77. Coogan, Tr. 3/7/08, 149:10–18.

78. Coogan, Tr. 3/7/08, 149:19–22.

79. Edwards, Tr. 3/3/08, 128:2–6.

80. 14 CFR § 91.155.

flight route as well as at the accident site. Based on his review of satellite images and other meteorological data Dr. Branscome concluded that, at all pertinent times, the area along the flight path of N441AW leading to the accident site and the accident site itself were overcast.[81]

Dr. Branscome concluded that the cloud base in the vicinity of the crash was 1,200 to 1,300 feet MSL.[82] The tops or height of the clouds in the area through which Mr. Wojciechowicz flew and at the crash location was approximately 6,500 feet MSL.[83]

At the altitude, time and location that the East Control position at the San Juan CERAP established radar contact with N441AW, when N441AW was approximately three miles east of Fajardo, the visibility looking forward from N441AW was at least ten miles. At that location, there were scattered cloud cover and the base of the clouds was 2,000 feet MSL.[84] Looking straight ahead from this position and altitude, the pilot would see the rising green terrain and the cloud base intersecting the rising terrain in the distance.[85] At that point, the pilot would also have ten miles visibility to his north (or three o'clock position).[86]

At about one minute prior to the crash, N441AW was approximately three nautical miles from the crash site. At that altitude, time and location, the forward visibility from the cockpit of N441AW was at least three nautical miles. The aircraft was approximately 500 feet below the cloud ceiling and had not yet entered the clouds ahead that intersected with the rising terrain.[87]

Approximately one minute before the crash, the pilot, if he were looking directly ahead of the aircraft and at his altitude, would have seen the base of the clouds intersecting with the terrain at 1,200 to 1,300 feet AGL.[88]

At about one minute before the crash, when the pilot could see clouds intersecting the uprising terrain at his twelve o'clock position three miles ahead, the visibility to the one, two, and three o'clock positions from the aircraft (to the right) was at least three miles. Because the terrain to the right from N441AW's position was also lower then the aircraft's altitude and because the aircraft was operating under VFR, the pilot could have safely turned to fly in that direction if he so desired without seeking permission from air traffic control.[89]

Approximately one-half mile before the point where N441AW impacted the terrain, the aircraft entered clouds.[90] When it entered the clouds, N441AW was approximately 200 feet above the bottom of the cloud.[91] This is consistent with the eyewitness observations of Luis Morales and Jose Saldaña.[92] Inside the cloud, the

81. Branscome, Tr. 3/5/08, 185:15–186:9.

82. Branscome, Tr. 3/5/08, 187:5–16; 3/6/08, 81:1–10.

83. Branscome, Tr. 3/5/08, 187:24–188:17.

84. Branscome, Tr. 3/5/08, 195:21–196:22.

85. Branscome, Tr. 3/6/08, 83:20–84:10.

86. Branscome, Tr. 3/5/08, 197:15–23; 205:18–206:10; 3/6/08, 84:10–20.

87. Branscome, Tr. 3/5/08, 198:14–25.

88. Branscome, Tr. 3/5/08, 199:1–12; Coogan, Tr. 3/7/08, 148:9–16.

89. Branscome, Tr. 3/5/08, 200:11–202:7; Edwards, Tr. 3/3/08, 193:14–194:17; Coogan, Tr. 3/7/08, 162:12–163:1; 3/10/08, 145:13–146:3.

90. Branscome, Tr. 3/6/08, 82:23–83:18; 88:3–7.

91. Branscome, Tr. 3/5/08, 199:16–200:9.

92. Branscome, Tr. 3/6/08, 3:17–4:17.

visibility was only 300 to 1400 feet.[93] N441AW was flying in cloud for approximately ten seconds before colliding with the terrain.[94]

Mr. Luis Morales testified at trial that he was standing outside his home and garage located on Road 191 in the Caribbean National Forest at the time of the accident. He saw the aircraft fly over his house at a low altitude and estimated that it was as close to his house as 300 feet.[95] He indicated that the entire day had been rainy with lots of clouds and fog.[96] When he saw N441AW fly overhead, Mr. Morales reported that it was raining lightly and there was "fog all around."[97] The witness was standing approximately 500 feet from the crash site.[98] He heard an explosion and saw a ball of fire and smoke coming from the crash.[99] Immediately after the crash, Mr. Morales ran to the La Muralla Restaurant about one hectometer away, where it was also rainy and foggy.[100]

Jose Saldaña was standing outside his restaurant, La Muralla, at the time of the crash.[101] He heard the sound of trees falling, then the explosion and felt the heat from the explosion.[102] The witness testified that it was so foggy at that time that he was unable to see a large parabolic antenna on his property that was approximately 100 to 150 feet from where he was standing.[103] Nor could he see the tree tops behind his house and restaurant.[104] Mr. Saldaña described the conditions at the time of the crash as "like being inside a cloud."[105]

Lt. Cruz Cartagena, a Puerto Rico State Police helicopter pilot, departed the Isla Grande Airport at approximately 2:30 p.m. in order to search for N441AW.[106] He was unable to see El Yunque mountain in the Caribbean National Forest when he departed because of the rain and low visibility.[107] The rain and low visibility also prevented Lt. Cartagena from searching for N441AW in the vicinity of the crash. He was forced to hold north of the crash site clear of the weather.[108] The witness was flying at approximately 500 feet and the rain and clouds obstructed his view of both the crash site and El Yunque Mountain.[109] Lt. Cartagena was able to locate the crash site and fly over it only after the clouds dissipated.[110]

Had Mr. Wojciechowicz not entered the clouds he would have had ample time to see and avoid the terrain with which he ultimately collided.[111] Mr. Coogan calcu-

93. Branscome, Tr. 3/5/08, 206:11–20.

94. Branscome, Tr. 3/6/08, 88:3–18.

95. Luis Morales ("Morales"), Tr. 3/5/08, 79:24–81:16.

96. Morales, Tr. 3/5/08, 79:8–13.

97. Morales, Tr. 4/5/08, 82:1–5.

98. Branscome, Tr. 3/6/08, 9:2–21.

99. Morales, Tr. 3/5/08, 85:22–23, 86:17–18.

100. Morales, Tr. 3/5/08, 91:5–7, 86:10–13.

101. Jose Saldaña ("Saldaña"), Tr. 3/6/08, 95:10–15; 96:17–21.

102. Saldaña, Tr. 3/6/08, 96:22–97:3.

103. Saldaña, Tr. 3/6/08, 97:23–98:17.

104. Saldaña, Tr. 3/6/08, 102:13–19.

105. Saldaña, Tr. 3/6/08, 103:17–19.

106. Cruz Cartagena ("Cartagena"), Tr. 3/5/08, 112:18–25.

107. Cartagena, Tr. 3/5/08, 114:2–22–116:16.

108. Cartagena, Tr. 3/5/08, 118:10–16; 120:18–122:2; 125:24–126:14.

109. Cartagena, Tr. 3/5/08, 122:5–123:2.

110. Cartagena, Tr. 3/5/08, 138:19–142:19.

111. Coogan, Tr. 3/7/08, 163:6–12.

lated that the average speed flown on this flight was about 206 knots.[112] Just before N441AW collided with the terrain, its speed was 212 knots.[113] The aircraft could have been flown safely at half this speed.[114]

Mr. Wojciechowicz failed in his duty to fly the aircraft in a prudent manner when he neglected to slow down, particularly when he was at a distance of approximately three miles from the crash site, given the decreasing visibility and the proximity of the cloud that was intersecting the rising terrain directly ahead of the aircraft.[115] Mr. Wojciechowicz again failed to act prudently when he continued to fly at the same speed, which he did not reduce, when he was but one mile from the clouds.[116] By slowing the aircraft's speed from 212 to 150 knots, the pilot would have doubled his available reaction time while flying at a speed that would have enabled him to safely control the aircraft and avoid colliding with the terrain.[117]

Mr. Wojciechowicz failed to act in a reasonably prudent manner when he "put[ ] himself or allow[ed] his aircraft to fly into a condition of weather where he deprived himself of a view of the path in which he was flying."[118]

W. Jeffrey Edwards, Plaintiffs' pilot expert, testified that the crash "had nothing to do with the weather" and that "there was no real obstruction as far as the weather was concerned, like fog."[119] This assertion is directly contradicted by the only expert meteorological testimony in the case, as well as by the testimony of disinterested eyewitnesses who saw N441AW flying in the fog and clouds and heard and saw the explosion following the aircraft's collision with the ground. Furthermore, Mr. Edwards' testimony was in itself contradictory as he also testified that there was fog in the area of the crash, although he could not "say exactly with any certainty . . . the fog was X thick, the visibility was X number of miles or whatnot."[120] Indeed, he had previously stated in his deposition that, around the time and vicinity of the crash, Mr. Wojciechowicz flew into patchy fog.[121]

Mr. Edwards further indicated that even though, in his opinion, VFR conditions were present at all times during the accident flight,[122] he could not explain why Mr. Wojciechowicz was unable to see El Yunque mountain.[123] Similarly, Mr. Edwards could not explain why, if Mr. Wojciechowicz was flying in Visual Meteorological Conditions, he did not become aware of the high terrain until a few seconds before he collided with the ridge.[124]

Mr. Edwards' opinion that the pilot's ability to see the terrain ahead of the aircraft may have been impeded by the position of the sun was directly contradicted by the testimony and evidence presented by Dr. Lee Branscome, an expert meteorologist. Dr. Branscome demonstrated that the sun was obscured at the crash site

112. Coogan, Tr. 3/7/08, 135:1–8.

113. Coogan, Tr. 3/10/08, 86:20–22.

114. Coogan, Tr. 3/10/08, 54:1–9; 56:7–57:7.

115. Coogan, Tr. 3/7/08, 162:12–23; 164:4–19.

116. Coogan, Tr. 3/7/08, 164:14–19.

117. Coogan, Tr. 3/7/08, 163:13–164:3; 3/10/08, 140:2–13, 140:21–141:7.

118. Coogan, Tr. 3/10/08, 109:23–110:3.

119. Edwards, Tr. 3/3/08, 156:21–157:5.

120. Edwards, Tr. 3/3/08, 152:20–153:8.

121. Edwards, Tr. 3/3/08, 226:3–228:16; 245:7–16.

122. Edwards, Tr. 3/3/08, 156:10–20.

123. Edwards, Tr. 3/3/08, 161:7–11.

124. Edwards, Tr. 3/3/08, 251:9–252:1.

by a 5,000–foot–thick layer of clouds above the aircraft.[125] The Court, therefore, does not credit the testimony by Mr. Edwards in this regard.

Situational awareness is the basic notion that a pilot should be aware of all the circumstances around the flight, including awareness of the terrain, the weather, and the control of the aircraft.[126] Mr. Edwards admitted that Mr. Wojciechowicz "lost situational awareness about exactly where his flight path was taking him."[127] Mr. Edwards testified that Mr. Wojciechowicz first lost situational awareness shortly after passing Fajardo Airport.[128] How the pilot could have lost situational awareness of his position and the terrain when, in Mr. Edwards' opinion, VFR conditions persisted throughout the flight, has not been explained. Moreover, Mr. Edwards contradicted himself by testifying that there were "rain showers in the vicinity[,][and][w]e know that they will reduce visibility somewhat."[129]

Mr. Edwards acknowledged that the pilot's actions caused this accident because Mr. Wojciechowicz was "responsible for the safety of his flying" and he was not aware of the proximity of his aircraft to the terrain.[130] Plaintiffs' expert testified that Mr. Wojciechowicz was able to see the ridge with which he collided but that he flew N441AW in such a manner that "it was too late to avoid the collision" without offering any explanation as to why the pilot had placed the airplane into that situation.[131]

In summary, the Court finds based on the evidence presented at trial that Mr. Wojciechowicz had the experience and equipment to know, with precision, his location, flight path, altitude and speed at all times during this flight. He also knew, or should have known, that it was his continuing responsibility to remain clear of all clouds and areas of low visibility. The pilot had, or should have had, the ability to look outside the aircraft and see the terrain over which the aircraft was flying and which the aircraft was approaching ahead and to adjust the aircraft's course and/or altitude to avoid it. Mr. Wojciechowicz flew N441AW on a course of his choosing, south of the most direct and unobstructed course to San Juan from Culebra, at a very low altitude, at an unnecessarily high speed, over ever-rising terrain he could easily see into an area of cloud and low visibility, which he could notice from miles away before he entered it. Flying into this area of adverse weather obstructed the pilot's view of the rising terrain to the point that the aircraft impacted the terrain shortly after the aircraft entered the cloud. Mr. Wojciechowicz's choice to fly at an unnecessarily high speed at low altitude significantly reduced his chances of seeing the terrain in time to avoid it. His actions in entering this type of weather were in clear violation of 14 C.F.R. § 91.155, a special regulation designed to prevent the very harm which occurred in this case.[132]

**The Air Traffic Controller Owed No Duty to the Pilot or Passengers to Issue a Safety Alert to N441AW During the Accident Flight**

FAA Order 7110.65M, entitled "Air Traffic Control," prescribes air traffic con-

---

125. Branscome, Tr. 3/5/08, 187:24–188:17.

126. Edwards, Tr. 3/3/08, 162:14–20.

127. Edwards, Tr. 3/3/08 159:17–160:2.

128. Edwards, Tr. 3/3/08, 167:1–5.

129. Edwards, Tr. 3/3/08, 167:22–168:2.

130. Edwards, Tr. 3/3/08, 159:2–16; 162:5–10; 163:14–17.

131. Edwards, Tr. 3/3/08, 251:16–252:1; 254:15–16.

132. The issue of whether air traffic controller Santiago was contributorily negligent is addressed below.

trol procedures and phraseology for controllers, who are required to be familiar with those portions of the Order that pertain to their operational responsibilities.[133] This Order instructs air traffic controllers to give first priority to separating aircraft and issuing safety alerts as mandated in the Order.[134]

FAA Order 7110.65M requires controllers to issue a terrain/obstruction safety alert to an aircraft if the controller is *aware* that the aircraft is in a position or *altitude* which, in the *controller's judgment,* places the aircraft in unsafe proximity to terrain or obstructions.[135] The responsibility to issue a safety alert applies to VFR and well as IFR aircraft.[136] Air traffic controller Marcos Santiago, who was on duty at the East Control position at the time of the accident, testified he would issue a Safety Alert to an aircraft operating under VFR if, in his judgment, the aircraft were in unsafe proximity to terrain.[137]

Plaintiffs' attorneys attempted to demonstrate Mr. Santiago's "mindset" with regard to his purported disregard for the rules under which he is to render services as an air traffic controller.[138]

In this vein, Mr. Martinez asked Mr. Santiago at trial the following question:

[B]ut if the VFR pilot is squawking a discrete code and you have communicated with that pilot and he displayed on your scope as the data block with altitude information speed, would you then provide a Safety Alert to that pilot if, in your opinion, that pilot is in unsafe proximity to terrain and obstruction?

Mr. Santiago responded:

I would only if he had requested it.[139]

However, when asked the same hypothetical question again by Mr. Martinez, Mr. Santiago responded:

If, in my judgment, he is in an unsafe proximity to the terrain, I would issue it.[140]

While the responses to these hypothetical questions may seem contradictory, the questions are just that—hypothetical. Consequently, the Court will disregard these answers and concentrate instead on the actual facts presented during the course of the trial.

An air traffic controller at the East Control position at the San Juan CERAP does not have a way of knowing how high above the surface of the terrain or above any trees or other objects on the terrain for that matter an aircraft may be flying. That is because the controller's radar display does not provide the controller with the aircraft's altitude above ground level (AGL).[141] Rather, the controller's radar display provides only the aircraft's altitude above mean sea level (MSL).[142]

The radar scope at the East Control position at the San Juan CERAP does not display terrain features [143] which means

133. Joint Exh. I p. 1–1–1 (PDF p. 47).

134. Joint Exhibit I p. 2–1–2 a. (PDF p. 55).

135. Joint Exh. I p. 2–1–6 a (PDF p. 57)(italics supplied).

136. Santiago, Tr. 2/27/08, 136:19–21.

137. Santiago, Tr. 2/26/08, 241:16–23.

138. Mr. Bass Closing Argument, Tr. 3/12/08, 30.

139. Tr. 2/26/08, 242:6–243:2.

140. Tr. 2/26/08, 241:20, 21.

141. Santiago, Tr. 2/26/08, 205:24–206:4.

142. Santiago, Tr. 2/27/08, 118:1–119:12; Edwards, Tr. 3/3/08, 47:15–48:7.

143. Santiago, Tr. 2/27/08, 137:24–138:12; 140:8–141:8; Parham, Tr, 3/4/08 (PM), 126:25–127:15; Coogan, Tr. 3/10/08, 108:3–17; Henderson, Tr. 3/10/08, 240:22–25; 242:20–243:10.

that the controller has no way of knowing what the terrain beneath the pilot is.[144] Nor does the controller know the VFR pilot's intentions as to his intended route of flight.[145] Rather, the controller expects a VFR pilot to maintain visual contact with the terrain and avoid it.[146]

The last full radar data block with a valid radar return displayed to Mr. Santiago on his radar by the San Juan (SJU) radar sensor was received from N441AW at 2:21:18 p.m., approximately one minute preceding the accident, at a position approximately 4.7 miles from El Yunque.[147] This location would not be a cause for Mr. Santiago to trigger an alert or even to turn on the St. Thomas (STT) sensor. The last "coast" data block [148] on N441AW was seen at 2:21:42 p.m., approximately 45 seconds prior to the crash.[149] Therefore, no information was displayed on Mr. Santiago's radar scope showing either an actual or predicted position of N441AW for 45 seconds before the accident and no terrain in the vicinity was ever depicted on the scope.[150]

The East Control air traffic controller generally cannot be aware that a VFR aircraft is in "unsafe proximity" to terrain because the controller does not have the terrain depicted on the scope. The controller is expecting the pilot to see the terrain; keep the aircraft at a safe altitude in reference to the terrain and to inform the controller if unable to do so.[151] The only way a controller would know that a VFR pilot may be in unsafe proximity to terrain is if the pilot himself informs the controller that he or she is unable to maintain safe terrain clearance. This is precisely what the controller expects the pilot to do.[152]

An air traffic controller expects pilots flying under VFR to advise the controller if the pilot is unable to provide his or her own separation from the terrain for any reason.[153] At no time during the accident flight did Mr. Wojciechowicz advise the controller that he was unable to or was having any difficulty in keeping his own separation from the terrain.[154] At no time during the accident flight did Mr. Wojciechowicz advise the controller that he was having any visibility problems as a result of the weather or that his intended route of flight would place N441AW in instrument meteorological conditions, or that he was having difficulty seeing the terrain

144. Henderson, Tr. 3/10/08, 240:17–21; Tr. 3/11/08, 143:23–144:3.

145. Santiago, Tr. 2/27/08, 109:12–110:11; Parham, Tr. 3/4/08 (PM), 69: 13–17; Henderson, Tr. 3/10/08, 237:24–238:10.

146. Santiago, Tr. 2/27/08, 117:24–118:2.

147. Edwards, Tr. 3/3/08, 75:2–22; 77:4–22.

148. As indicated by David Valentin, the controller who provided information to the Court during the visit to the San Juan CERAP on April 15, 2008, "coast" data blocks show the aircraft's predicted position and are presented to the controller for a short time after the radar loses contact with an aircraft. Valentin, Tr. 4/15/08 (CERAP visit), 42:1–12. In coast, no radar target is displayed. Henderson, Tr. 148:17.25.

149. Henderson, Tr. 3/10/08, 244:21–245:24.

150. Henderson, Tr. 3/10/08, 246:8–17.

151. Santiago, Tr. 2/27/08, 90:11–16; 137:20–138:3; 142:5–11; Ortiz, Tr. 2/28/08, 44:9–46:10; Parham, Tr. 3/4/08 (PM), 67:18–68:4; Henderson, Tr. 3/10/08, 250:23–251:12; 3/11/08, 129:6–25; 164:15–18.

152. Santiago, Tr. 2/27/08, 116:12–16; 137:20–138:3; 142:5–11; Ortiz, Tr. 2/28/08, 44:9–19; Henderson, Tr. 3/10/08, 250:23–251:12.

153. Santiago, Tr. 2/27/08, 116:12–16; 137:17–138:3; 142:5–14.

154. Santiago, Tr. 2/27/08, 112:6–8.

because of the sun angle. Nor did the pilot give any indication that he was unsure of the aircraft's position with reference to his intended route of flight or destination.[155]

A VFR aircraft approaching higher terrain is not a cause for an air traffic controller to be concerned, as the pilot is expected to have the terrain in sight and to avoid it.[156]

The Court finds that controller Santiago was under no duty to issue a safety alert to N441AW under the circumstances of this case. N441AW was being flown under VFR, which means that the pilot was responsible for selecting an altitude and course that enabled him to comply with the Federal Aviation Regulations regarding weather minima and terrain avoidance. Although an air traffic controller must issue a safety alert to a VFR aircraft if the controller is aware the aircraft, in the controller's judgment, is in unsafe proximity to terrain, the rules of VFR flight necessarily shift the awareness of what might be "unsafe proximity" to terrain to the pilot. Moreover, with neither terrain nor an aircraft target depicted on Santiago's radar scope, only the pilot was in a position to know whether the aircraft was located at an unsafe proximity to terrain. Even if Santiago was aware of the high terrain in the El Yunque rain forest area, he was under no duty to issue a safety alert to a VFR pilot whom the controller may have reasonably presumed was complying with the Federal Aviation Regulations by flying in clear air, maintaining sight of the terrain ahead of the aircraft, and avoiding it.

The Court rejects the testimony of Mr. Parham, Plaintiff's air traffic control expert, that a VFR aircraft flying level and heading toward higher terrain invokes the air traffic controller's duty to issue a safety alert.[157] Mr. Parham's opinion is directly contrary to the pilot's responsibility when flying VFR to see and avoid terrain and to remain clear of weather. Moreover, the dearth of information available to the controller about the specifics of the terrain in the vicinity of the VFR pilot, as well as the controller's inability to know the pilot's intentions or capabilities, make it impossible for the controller to know if the pilot is in "unsafe proximity" to terrain. The pilot has the best, indeed, the only perspective from which such a determination can be made.

The Court also rejects Mr. Parham's opinion that the presence of the aircraft's MSL altitude on the controller's scope, combined with the presence of the high terrain and mountains of the El Yunque rain forest, also required that Santiago issue a safety alert. The Court cannot credit this testimony because there was no terrain depicted on the controller's radar scope and although the positions of obstructions atop El Yunque and Pico del Este are marked on the scope, Mr. Parham admitted there is no information given on the scope as to the elevation of these obstructions.[158] Once again, the pilot is the only person in a position to judge whether the altitude and route he has chosen place the aircraft in unsafe proximity to the terrain which he is, or should be, observing outside the aircraft.

**The Presence of Minimum Vectoring Altitudes on the Controller's Radar Display Did Not Create a Duty To Issue a Safety Alert**

Minimum Vectoring Altitudes, or "MVAs," are depicted on the East Control radar display and show geometric blocks of airspace with associated altitudes. The

**155.** PTO Admitted Facts (docket No. 95) ¶ 76; Edwards, Tr. 3/3/08, 161:20–162:5.

**156.** Henderson, Tr. 3/11/08, 103:8–13.

**157.** Parham, Tr. 3/4/08 (PM), 33:7–14.

**158.** Parham, Tr. 3/4/08, 127:9–13.

associated altitude in each block is the lowest altitude which a controller can assign to an aircraft flying under IFR in that particular airspace.[159]

The Court rejects Mr. Parham's opinion that because Mr. Santiago had the MSL altitude of N441AW available to him and that the aircraft was flying through areas where the minimum vectoring altitude was above the aircraft's altitude, Mr. Santiago should have issued a safety alert.[160] The evidence at trial, including Mr. Parham's own admission, was that MVAs apply only to airplanes flying under IFR whereas pilots flying VFR are allowed to fly below the MVA.[161] Moreover, almost all VFR aircraft in the CERAP's airspace fly below the MVA.[162] It is not alarming to an air traffic controller to see VFR aircraft flying below the MVA in his radar scope because the VFR pilots are expected to maintain visual contact with the terrain and avoid it.[163] An air traffic controller does not know what "too far below the MVA" is because VFR pilots are allowed to fly below the MVA and they are responsible to look out and keep the terrain in sight.[164]

Based on the foregoing, the Court finds that the depiction of the aircraft's MVAs on controller Santiago's radar scope did not give rise to a situation which would have caused him to believe that N441AW was in danger. Consequently he had no duty to issue a safety alert to the pilot based on this data.

## No Alleged Deficiencies in the Training of Controller Santiago Were a Cause of the Accident

The Court disagrees with Mr. Parham's opinion that if certain training had been given as he believed it should have, Mr. Santiago would have had more specific knowledge of the elevations of the three mountain peaks in the Caribbean National Forest.[165]

Mr. Santiago testified that he was generally familiar with the location of the Caribbean National Forest on his radar, which he referred to as "El Yunque," as well as the general location of the mountains.[166] The Court finds credible as well as understandable that Mr. Santiago did not know the details of the peaks and valleys that might have been in the area.[167]

The evidence at trial showed that the training the controllers receive at the CERAP concerning terrain is accomplished by requiring them to know the Minimum Vectoring Altitudes for the various areas within their fields of jurisdiction.[168] The controllers are expected to be aware generally of the location of the El Yunque mountain range.[169]

159. Santiago, Tr. 2/26/08, 144:25–145:8.

160. Parham, Tr. 3/4/08 (PM), 10:6–12.

161. Santiago, Tr. 2/27/08, 90:11–21; 127:14–18; Ortiz, Tr. 2/28/08, 106:3–8; Fraticelli, Tr. 2/29/08 (PM), 10:1–9 (no safety alert issued to VFRs below MVA); Parham, Tr. 3/4/08 (PM), 72:17–19; 73:16–21 (ATC should not suggest that VFR pilot fly above MVA); 128:13–15; Henderson, Tr. 3/11/08, 164:24–165:7 (VFR pilot may fly below MVA, and doing so is not alarming to controller—"thousands do it every day").

162. Santiago, Tr. 2/27/09, 116:2; Ortiz, Tr. 2/28/08, 106:9–20; Fraticelli, Tr. 2/29/08 (AM), 42:24–43:4.

163. Santiago, Tr. 2/27/08, 116:3–11.

164. Santiago, Tr. 2/27/08, 117:19–118:14.

165. Parham, Tr. 3/4/08 (PM), 56:15–57:2; 60:4–7.

166. Santiago, Tr. 2/27/08, 7:1–4; 9:10–13; 138:18–139:11; 180:22–181:4; 181:10–14.

167. Santiago, Tr. 2/27/08; 179:167:7–14.

168. Fraticelli, Tr. 2/28/08, 209:1–20.

169. Fraticelli, Tr. 2/28/08, 211:8–20; Santiago, Tr. 2/26/08, 138:19.

The evidence also showed that in the FAA system, the facility manager is given leeway in adapting nationally-directed training programs to local requirements.[170] At San Juan, controllers receiving initial training were instructed on the presence of "significant terrain areas" through memorization of the Minimum Vectoring Altitudes.[171] This is so because in Puerto Rico, all the significant terrain is reflected in the MVAs and IFR aircraft are kept above the MVAs.[172] As to VFR aircraft, there are no requirements for issuing altitudes based on the MVAs.[173]

Mr. Henderson, the Government's air traffic control expert who held several positions in the FAA which required him to develop and implement training programs,[174] testified that the methods the San Juan CERAP used to train controllers on terrain in their areas of jurisdiction complied with the national FAA requirements.[175] This is so because the requirement is for controllers to be **generally** familiar with the terrain, as Santiago was.[176] The training does not require the controllers to know the elevation of specific terrain features like hills, valleys, and ridge lines.[177]

Moreover, the Court also finds, consistent with the Court's Conclusions of Law, that the general terrain knowledge required of controllers does not give them superior knowledge of the terrain to that of a VFR pilot, who is required to keep the terrain in sight at all times and to avoid it.[178] The VFR pilot can fly down into valleys or circle mountains if he so desires or if he needs to do so to maintain VFR. Therefore, a controller's general knowledge of the terrain underlying his area of jurisdiction does not provide him with sufficient information regarding a VFR aircraft's "unsafe proximity" to terrain to mandate issuance of a safety alert.[179]

Accordingly, the Court concludes the training given Mr. Santiago on significant terrain features in the East Control area of responsibility complied with the FAA's requirements.

**The "Seven–Sided Polygon" Depicted on the East Controller's Radar Display Does Not Represent the Caribbean National Forest Flight Avoidance Area and Did Not Create a Duty for the Controller To Issue a Safety Alert**

The Court finds immaterial Plaintiffs' suggestion that the MVA described as the "seven-sided polygon" depicted on radar scope represents the boundaries of the Caribbean National Forest Flight Avoidance Area. It is uncontroverted that N441AW never entered this area.

The only evidence presented at trial was to the effect that the "seven-sided polygon" is an MVA area, not a depiction of the Caribbean National Forest Flight Avoidance Area.[180] Plaintiffs' counsel did not ask their air traffic control expert whether the "seven-sided polygon" repre-

170. Fraticelli, Tr. 2/29/08, 36:3–6.

171. Fraticelli, Tr. 2/29/08, 41:7–19.

172. Fraticelli, Tr. 2/29/08, 41:20–24.

173. Fraticelli, Tr. 2/29/08, 41:25–42:3.

174. Henderson, Tr. 3/11/08, 141:19–142:6.

175. Henderson, Tr. 3/10/08, 254:9–17.

176. Henderson, Tr. 3/10/08, 254:18–255:5.

177. Henderson, Tr. 3/11/08, 144:4–10; Coogan, Tr. 3/10/08; 108:3–17.

178. Henderson, Tr. 3/11/08, 143:14–22.

179. Henderson, Tr. 3/10/08, 255:11–18.

180. Santiago, Tr. 2/27/08, 180:14–18; Ortiz, Tr. 2/28/08, 17:10–14; Fraticelli, Tr. 2/29/08,

sented the Caribbean National Forest area. Rather, Mr. Parham testified incorrectly that the figure is an MVA of 5,700 feet.[181]

Prior to trial Plaintiffs abandoned any claim that air traffic controllers at the San Juan CERAP had a duty to prevent N441AW from flying into the Caribbean National Forest Flight Avoidance Area at an altitude less than 2,000 feet above the ground.[182] However, Plaintiffs maintained their allegation that controllers had or should have had knowledge of the Flight Avoidance Area and that this knowledge gave or would have given them better awareness of the higher terrain elevations in that area.[183] Even assuming this allegation to be true, such knowledge would not have given the air traffic controller in this particular case any more reason to issue a safety alert to a VFR aircraft under its own navigation, transiting the area of the Caribbean National Forest.

Consequently, the issue of the size of the seven-sided polygon as depicted on radar scope, be it as small as a pencil eraser or substantially larger as the Court was able to personally observe at the CERAP site inspection, is immaterial.

## The Lack of an Emergency Obstruction Video Map ("EOVM") at the San Juan CERAP at the Time of the Accident Was Not Negligence and the Lack of an EOVM Was Not a Cause of the Accident

In February 2000, FAA Headquarters conducted a "Full Facility Evaluation" of the San Juan CERAP.[184] At that time, FAA Order 7210.3R required that an EOVM be installed at terminal facilities with designated mountainous terrain within their radar coverage *if* the facility had an "available channel in their video mappers." [185] An EOVM is a video map that depicts some contour lines and obstacles on a controller's scope when it is called up for display by the controller.[186]

The team conducting the Full Facility Evaluation found ambiguity in FAA Order 7210.3R because the CERAP did not have a "video mapper." [187] Instead, the CERAP was using a "Micro–EARTS" system which used digitally-generated video maps. However, digitally-generated maps are unrelated to "video mappers." [188] Because of this ambiguity, the evaluation team rated the lack of EOVM as "Informational" thereby identifying it as an item of interest to higher headquarters and seeking resolution, rather than using a stronger rating such as "Problem." [189] The "Information-

11:25–12:7; Henderson, Tr. 3/11/08, 9:19–10:12.

181. Parham, Tr. 3/4/08 (PM), 10:6–7.

182. See Plaintiffs' Opposition (docket No. No. 68) p. 1.

183. See Plaintiffs' Opposition (docket No. No. 68) pp. 1–2.

184. Joint Exh. XXXVI; Fraticelli, Tr. 2/29/08 (AM), 15:15–22.

185. Joint Exh. V, FAA Order 7210.3R, ¶ 3–9–4 (PDF p. 114).

186. Fraticelli, Tr. 2/28/08, 212:3–9.

187. Fraticelli, Tr. 2/28/08, 216:2–218:11; 2/29/08 (a.m.), 21:6–13.

188. Henderson, Tr. 3/10; 11/08, 153:9–24. The question at the time of the Evaluation was whether or not this provision applied to the CERAP, which issue arose because of the differences between "video mappers" (as required in the FAA Order) and "digital map button" (the equipment installed at San Juan CERAP). Henderson, Tr. 3/11/08, 159:7–11. The Court notes that the United States admitted during discovery that at the time of the Full Facility Evaluation the CERAP had an available "digital map button" but did not admit that the CERAP had a "video mapper." Comments of Counsel, Tr. 2/29/08 (AM), 22:15–19.

189. Fraticelli, Tr. 2/29/08 (AM), 52:1–2, 53:3–15, 54:12–55–12; Defendant's Exh. I p. 3 (definition of "Informational" in FAA Order 7010.1K); Joint Exh. XXXVI.

al" item identified in the 2000 Full Facility Evaluation did not put the CERAP in violation of, or in noncompliance with, FAA Order 7210.3R.[190]

Because the "Informational" item demanded resolution by the FAA before an EOVM would be required at the CERAP, managers at the CERAP took no action to install the system at that time.[191]

Having heard further factual details on the issues involved during trial, the Court finds that the CERAP was justified in its position in 2000 that it was not required to install an EOVM at that time because a genuine incertitude existed within the FAA as to whether or not installation was mandated.

Even assuming the claims based on the lack of an EOVM at the San Juan CERAP are not barred by the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), the Court concludes that this absence did not constitute negligence. Based on the evidence presented at trial, the decision of the managers of the San Juan CERAP not to install the EOVM while awaiting FAA Headquarters' resolution of the Full Facility Evaluation "Informational" item arose from a genuine doubt as to its applicability to the local facilities and was, therefore, reasonable. Moreover, the Court finds that the lack of an EOVM was not a cause, proximate or otherwise, of the accident and rejects Mr. Parham's opinions to the contrary.

Based on the Court's CERAP's site inspection and opportunity to view an EOVM, the Court further notes that the terrain, as depicted on the EOVM, simply consists of contour lines without elevation annotations and obstruction symbols with elevation figures. Moreover, the aircraft accident site is not within the terrain outlined by the contour lines.

Mr. Parham opined that had the EOVM been locally available, Mr. Santiago would have received training concerning the EOVM which would have increased his knowledge of the high terrain in the East Control area under his responsibility.[192] However, Mr. Parham was never a training specialist or manager and never worked at an FAA terminal facility. Rather, his opinion was based on the training Mr. Parham claims to have received and was given at the Atlanta Center when he was a controller at that location.[193] In contrast thereto, Mr. Henderson, the Government's air traffic control expert, who was also a former training manager and manager of a terminal air traffic control facility, testified that the training a controller would receive on EOVM would not increase the controller's knowledge of terrain under his airspace beyond what was already known.[194] Moreover, nothing about the EOVM puts the controller in a better position than a VFR pilot to determine "unsafe proximity" from terrain and cue the controller to issue a safety alert.[195]

The Court rejects Mr. Parham's opinion to the effect that, had the equipment been available, controller Santiago could have or would have called up the EOVM map and recognized that N441AW was in danger.[196]

190. Fraticelli, Tr. 2/29/08 (AM), 21:6–13, 54:1–8; Henderson, Tr. 3/10/08, 260:14–19; 3/11/08, 157:6–11.

191. Fraticelli, Tr. 2/28/08, 222:8–16.

192. Parham, Tr. 3/4/08 (PM), 61:4–24.

193. Parham, Tr. 3/4/08 (AM), 86:13–87:10, 88:1–4; 3/4/08 (PM), 48:1–18.

194. Henderson, Tr. 3/11/08, 91:15–22.

195. Henderson, Tr. 3/10/08, 265:12–19; 3/11/08, 164:19–23.

196. Parham, Tr. 3/4/08(PM), 61:16–24.

This opinion disregards FAA Order 7110.65M as well as FAA Order 7210.3R which provide that the EOVM "shall only be used" if the aircraft cannot maintain safe terrain clearance altitudes and the pilot declares an emergency, or if the controller determines an emergency exists because of the pilot's inability to maintain an appropriate terrain clearance altitude.[197] At no time during the accident flight did Mr. Wojciechowicz declare an emergency or indicate that he was unable to maintain a safe altitude nor was there any evidence concerning the trajectory or altitude of the aircraft that would have caused a controller to believe that an emergency existed.[198]

The Court declines to accept Mr. Parham's opinion that N441AW was not able to maintain a safe altitude and that an emergency existed because the aircraft maintained a constant altitude while the terrain below it was rising.[199] No evidence was introduced at trial indicating that the controller was privy to this information. Nothing about EOVM puts the controller in a better position than the VFR pilot to determine "unsafe proximity" from terrain at any given moment during a flight under VFR or in any way cue the controller to issue a safety alert.[200]

Absent evidence that Mr. Wojciechowicz experienced an emergency and was unable to maintain altitude or that he notified anyone of such problems, the Court finds

that there would have been no reason for Mr. Santiago to refer to the EOVM to determine if N441AW, a VFR flight whose pilot was responsible for maintaining safe separation from the terrain, was in unsafe proximity to terrain and issue a safety alert.

### The Lack of a Pilot Weather Report During the Accident Flight Was Not a Cause of the Accident

The Court rejects Mr. Parham's opinion that the lack of a pilot weather report [201] concerning visibility in the vicinity of El Yunque was a cause of the accident.[202]

The Court initially notes that Mr. Parham's testimony that a PIREP would have prevented the accident is contradicted by the testimony of Mr. Edwards, Plaintiffs' pilot expert. Mr. Edwards testified that weather was *not* a factor in the accident.[203] Thus, there would have been no PIREP weather report to relay to Mr. Wojciechowicz which could have been a cause for concern.

Mr. Santiago came on position at the East Control sector at 2:12 p.m. on January 5, 2002.[204] The accident occurred only ten minutes later, at 2:22 p.m.[205] The lack of a request or receipt by the controller of a PIREP in the ten-minute interval prior to the accident has not been shown to have any bearing on the accident.

197. Joint Exh. I, FAA Order 7110.65M, ¶ 10-2-15 (PDF p. 384); Joint Exh. V, FAA Order 7210.3R, ¶ 3-9-4 c (PDF p. 114).

198. PTO Admitted Facts ¶ 75 (docket No. 95); Fraticelli, Tr. 2/29/08 (PM), 13:24-14:4; Parham, Tr. 3/4/08 (PM), 46:24-47:3; Henderson, Tr. 3/11/08, 162:15-20.

199. Parham, Tr. 3/4/08 (PM), 46:8-9, 47:1-3.

200. Henderson, Tr. 3/10/08, 265:12-19; 3/11/08, 164:19-23.

201. Pilot Weather Reports or "PIREPs" are pilot observations of inflight weather condi-

tions radioed voluntary to Air Traffic Control facilities. This information is used by other pilots to avoid adverse weather and by the National Weather Service to amend or update its forecasts.

202. Parham, Tr. 3/4/08 (PM), 54:22-55:7.

203. Edwards, Tr. 3/3/08, 156:21-157:5.

204. Santiago, Tr. 2/26/08, 176:24-177:1.

205. Henderson, Tr. 3/10/08, 245:19-20.

The Court also finds that it is a VFR pilot's responsibility to avoid weather that is below the minimums for VFR flight in the airspace in which the pilot is operating. These weather minimums are prescribed in the FARs and the AIM. Furthermore, the evidence received at trial establishes that, when N441AW was abeam Fajardo several minutes before the crash, the pilot had a 10–mile visibility and that in the distance, he could see the clouds as they intersected the green rising terrain.[206] The pilot's ability to continue to see the clouds as the aircraft approached the crash site was also established.[207] The Court rejects Parham's opinion that a PIREP about the very weather that Mr. Wojciechowicz could clearly see would have prevented the accident both as illogical and speculative.

**Controller Santiago Was Under No Duty To Issue A So–Called "Safety Advisory," and the Lack of Such an Advisory Was Not a Proximate Cause of the Accident**

The Court also rejects Mr. Parham's opinion that Mr. Santiago should have issued what the expert referred to as a "safety advisory" concerning the high terrain in Puerto Rico at about the time N441AW was crossing the shoreline near Fajardo.[208] Plaintiffs failed to introduce evidence demonstrating that a "safety advisory" is a service that controllers provide. On cross-examination, Mr. Parham admitted that such a "safety advisory" was not identified in any of the services provided to pilots by air traffic control as described in either FAA Order 7110.65, in the Pilot–Controller Glossary appended to FAA Order 7110.65 or the AIM.[209]

The only support proffered by Mr. Parham for his opinion on this issue was that he had seen an entry entitled "traffic and safety advisories" in the training records of Mr. Ortiz in 1993 and 1996.[210] However, Plaintiffs failed to present the contents of this training course even though they called Mr. Ortiz as a witness at trial.

On the other hand, Mr. Henderson, a training specialist and manager during his FAA career, credibly testified that he was unaware of "safety advisories" and that he knew of no such training, surmising that the designation in Mr. Ortiz's training record was simply a label.[211] Mr. Henderson had never heard of a "safety advisory" during his career and could not find any reference to this term in either the Pilot–Controller Glossary, the AIM, or FAA Order 7110.65.[212]

The Court further finds that Mr. Santiago's failure to issue an undefined, general "safety advisory" to Mr. Wojciechowicz about high terrain as the pilot crossed the coast near Fajardo did not cause or contribute to the accident. The uncontroverted evidence showed that Mr. Wojciechowicz had previously flown an aircraft between Culebra and San Juan on at least 200 occasions.[213] The general area of El Yunque was visible from the aircraft during those trips.[214] Moreover, during the accident flight, the pilot would have been able to see the up sloping terrain leading

---

206. Branscome, Tr. 3/5/08, 200:11–202:7; 3/6/08, 83:20–84:10.

207. Branscome, Tr. 3/5/08, 195:15–200:4.

208. Parham, Tr. 3/4/08 (PM), 20:6–22:11.

209. Parham, Tr. 3/4/08 (PM), 106:17–109:18.

210. Parham, Tr. 3/4/08 (PM), 109:20–110:10.

211. Henderson, Tr. 3/10/08, 251:20–252:4.

212. Henderson, Tr. 3/10/08, 253:5–12.

213. Carol Wojciechowicz, Tr. 3/5/08, 14:4–7; PTO Admitted Facts ¶ 73 (docket No. 95).

214. Susan Wojciechowicz Caldwell, Tr. 2/26/08, 118:2–19.

to the Caribbean National Forest when N441AW crossed the coast.[215]

Based on the foregoing, the Court concludes that there was no duty to issue a "safety advisory" as proffered by Mr. Parham.

### Controller Santiago Was Not Observing N441AW on the St. Thomas Radar Sensor

The Court finds that at the time of the accident Mr. Santiago was monitoring radar data originating from the San Juan (SJU) sensor and not from the St. Thomas (STT) sensor.

At the outset, Plaintiffs failed to introduce evidence showing why or when Mr. Santiago would have switched his scope to the STT sensor.[216] Even though Plaintiffs' counsel speculated that the switch could have been made because Mr. Santiago lost radar contact with N441AW,[217] the evidence shows that the loss of radar contact is not uncommon[218] and that pilots are warned about this possibility in the AIM Pilot-controller Glossary.[219]

Moreover, Mr. Santiago credibly testified that, during the period he served as a controller at the San Juan CERAP, he never used the STT sensor when working traffic at the East Control position nor did he know of anyone else at the CERAP using it.[220] Further, the air traffic controller indicated that he remembered specifically using the San Juan sensor on the day of the accident.[221] Additionally, local operating procedures applicable at the CERAP at the time required the East Control position to switch to "MOSAIC,"[222] not STT, if the San Juan radar went down.[223] Plaintiffs' contention that Mr. Santiago was using the STT radar is also belied by the uncontroverted fact that two seconds after the STT radar data indicated it still had radar contact with N441AW, the transcript shows that Mr. Santiago transmitted that he had lost radar contact with N441AW.[224] Under Plaintiffs' premise that Mr. Santiago was watching N441AW while using the STT radar, he would have made the aforementioned transmission while a valid beacon target and data block were still displayed on his radar scope.[225] However, according to the undisputed evidence, an air traffic controller would not issue a "radar contact lost" transmission while a valid

---

215. Branscome, Tr. 3/5/08, 200:11–202:7; 3/6/08, 83:20–84:10.

216. Parham, Tr. 3/4/08 (p.m.), 12:3–19, 81:21–82:5.

217. Comments of Counsel, Tr. 3/4/08 (p.m.), 89:11–13.

218. Santiago, Tr. 2/27/08, 128:15–21.

219. Coogan, Tr. 3/10/08, 106:6–107:5; Henderson, Tr. 3/11/08, 118:16–120:4; 166:16–167:25.

220. Santiago, Tr. 2/27/08, 150:1–7. The Court also notes that Mr. David Valentin, the controller who provided information during the on site visit to the San Juan CERAP on April 15, 2008, testified that he had never used the STT radar in a controller preference set for the East Control position. Valentin, FAA Site Inspection Tr. 4/15/08, 51:14–52:10.

221. Santiago, Tr. 2/27/08, 148:6–9.

222. Mosaic is a capability of the Micro-EARTS automated tracking system that combines radar input from more than one radar antenna into a single radar picture displayed on the controller's scope. FAA Order 7110.65M, ¶ 5–5–4 b Note.

223. Santiago, Tr. 2/27/08, 144:5–11.

224. Henderson, Tr. 3/10/08, 232:1–9. Further, the parties stipulated that the times listed for transmissions on the transcripts of transmissions for the East Radar and Operational Supervisor positions and the times listed for radar data on the CDR data are congruent. PTO Stipulated Facts ¶ 70 (docket No. 95).

225. Henderson, Tr. 3/10/08, 233:1–6.

radar beacon target or data block was being displayed on the radar for that aircraft.[226] Indeed, plaintiffs' witness, Mr. Parham, agreed that he would never issue "radar contact lost" if he still had a valid data block and beacon target.[227]

Accordingly, the pertinent radar data and transcripts demonstrate the lack of merit in Plaintiffs' allegation that Mr. Santiago was watching the STT radar data and not the SJU radar data when radar contact with N441AW was lost.

Moreover, the substantial operational effects which would result from a controller's decision to unilaterally change the sensor—and the absence of evidence of any such effects occurring in this case—further confirm our conclusion that Mr. Santiago did not use the STT sensor on January 5, 2002. Changing to the STT sensor eliminates the capability of East Control to provide Class C services to aircraft and also changes the minimum vectoring altitudes.[228] No evidence was introduced at trial indicative that any such operational results occurred during the period that Mr. Santiago was on duty on the day of the accident.

Another significant operational effect of moving from one sensor to another is that the controller would not be able to monitor all of the aircraft in his sector during the switching procedure. Switching between the SJU and STT sensors causes the controller's display to re-align itself and cen-ter on the STT radar 40 miles away, thereby losing more than half the East Control area of responsibility from the scope.[229] To adjust the display to again show all of the East Control required airspace requires ten or more keyboard entries ranging from 15 to 20 seconds to carry out the operation.[230] Throughout this period of time, the controller would not be able to monitor all of the aircraft in his sector.

The Court also finds unpersuasive Plaintiffs' argument that Mr. Santiago had been using the STT radar because he was able to state the location of the crash by reference to communications with other aircraft several minutes after he had transmitted that radar coverage had been lost.[231] Mr. Edwards testified that he considered Mr. Santiago's statement that he lost radar contact with N441AW at a position 15 miles east-southeast of San Juan to be the most accurate estimate of where the controller last saw the aircraft.[232] However, Mr. Santiago himself testified that these measurements were only estimates and approximations from the "general area" where he lost contact.[233]

The overwhelming evidence indicates and the Court so finds, that Mr. Santiago was not observing N441AW using the STT radar on the day of the accident. Rather, he was viewing instead the SJU data in accordance with the San Juan CERAP's standard operating procedures.

**226.** Santiago, Tr. 2/27/08, 130:24–131:6; Henderson, Tr. 3/10/08, 233:24–234:3.

**227.** Parham, Tr. 3/4/08 (PM), 83:14–18, 106:13–16.

**228.** Parham, Tr. 77:1–17; Santiago, Tr. 2/27/08, 150:8–17; Henderson, Tr. 3/10/08, 206:12–23; Parham, Tr. 3/4/08, 96:10–97:1 (separation criteria change could result in operational error "if someone saw that").

**229.** Valentin, CERAP Site Inspection Tr. 4/15/08, 73:8–22.

**230.** Valentin, CERAP Site Inspection Tr. 4/15/08, 74:9–16.

**231.** Parham, Tr. 3/4/08 (PM), 12:7–15.

**232.** Edwards, Tr. 3/3/08, 89:16–19.

**233.** Santiago, Tr. 2/27/08, 65:7–66:3, 134:9–12. The Court notes that, during its visit to the CERAP on April 15, 2008, Mr. Valentin measured the distance between the San Juan airport and the accident site at 14 miles, not 15 miles. CERAP Site Inspection Tr. 17.

## Controller Santiago Did Not Owe a Duty to Separate N441AW from Obstructions

The Court finds unpersuasive Plaintiffs' argument, introduced during Mr. Henderson' cross examination, that Mr. Santiago owed a duty under the circumstances of this case to separate N441AW from "prominent obstructions" depicted on the controller's radar scope by a distance of three or five miles, depending on which radar antenna was providing information to Mr. Santiago's scope.[234] According to ¶ 5–5–9 of the Air Traffic Control Manual, FAA Order 7110.65M, controllers must "separate aircraft" from "prominent obstructions" as described in the provision by a distance of three or five miles, depending on the distance the obstacle is from the radar antenna providing data to the controller.[235]

Even assuming *arguendo* that ¶ 5–5–9 were applicable to the facts in this case, the Court, as an initial matter, finds that its requirements were not violated. Mr. Santiago was using the San Juan radar antenna during his handling of N441AW. The radar target for the aircraft dropped from the San Juan radar *before* N441AW came within three miles of the obstacle depicted on controller Santiago's radar scope representing the antennas on El Yunque.[236] Without the aircraft remaining in radar contact it would have been impossible for Mr. Santiago to apply the aforementioned radar separation criteria to N441AW.[237] Thus, the provisions of ¶ 5–5–9 could not have been implemented be-

cause the aircraft was not visible on Mr. Santiago's radar scope.

Nevertheless, the Court finds ¶ 5–5–9 inapposite to this case and fully credits the opinion of Mr. Henderson, the only witness to testify with respect to its applicability. Mr. Henderson indicated that ¶ 5–5–9 is pertinent only to aircraft flying under Instrument Flight Rules and not to VFR aircraft.[238] Indeed, the expert noted that in his more than 40 years experience in air traffic control he had never seen the provisions of ¶ 5–5–9 used for VFR aircraft.[239]

The Court also finds Mr. Henderson's opinion consistent with the fundamental nature of flight under Visual Flight Rules. The expert credibly testified that Mr. Santiago had no duty to separate N441AW from terrain or obstacles and that safe separation from terrain was the pilot's sole responsibility.[240] Mr. Henderson testified, as did many other witnesses during trial, that the selection of route and altitude is the sole prerogative of the VFR pilot because the VFR pilot must be able to maneuver as needed to maintain flight in VFR conditions and avoid terrain and obstacles.[241] The Court agrees with the expert's opinion that, requiring air traffic controllers to steer VFR aircraft so that they avoid such obstacles by the stated minima would conflict with the very requirements of VFR flight. A pilot flying under Visual Flight Rules must be able to choose an appropriate course and altitude to maintain visual weather conditions and see and avoid terrain and obstacles.[242] If

234. Henderson, Tr. 3/11/08, 34:11–234 –35:2.

235. Joint Exh. I, ¶ 5–5–9 a.

236. Henderson, Tr. 3/11/08, 61:10–12, 151:20–23.

237. Henderson, Tr. 3/11/08, 61:20–62:14.

238. Henderson, Tr. 3/11/08, 40:20–24, 146:12–16.

239. Henderson, Tr. 3/11/08, 150:6–151:4.

240. Henderson, Tr. 3/10/08, 238:11–18.

241. Henderson, Tr. 3/10/08, 237:24–238:10.

242. Henderson, Tr. 3/11/08, 146:17–147:12, 184:2–11.

¶ 5–5–9 were applied to VFR aircraft, situations could potentially arise where a controller would need to direct a VFR aircraft around an obstacle but the direction could take the VFR aircraft into weather below VFR minimums.

Further, Plaintiffs' argument that ¶ 5–5–9 was extensive to the services provided to N441AW by controller Santiago cannot be reconciled with the testimony given by Plaintiffs' experts. For instance, Mr. Parham, Plaintiffs' air traffic control expert, indicated that Mr. Wojciechowicz was responsible for maintaining his own separation from terrain and obstacles, even though the pilot was receiving radar services.[243] According to Mr. Parham, Mr. Wojciechowicz, like all VFR pilots, was under his own navigation and was responsible for choosing his own routing notwithstanding receiving radar services from air traffic control.[244] Plaintiffs' expert further testified that VFR pilots, like Mr. Wojciechowicz, are responsible for maintaining flight in weather conditions equal to or better than those called for in the FARs.[245] Moreover, the AIM, which informs pilots regarding some air traffic control procedures, flatly states that no separation services are provided to VFR aircraft in Class E airspace, the type of airspace N441AW flew during most of the accident flight.[246] Similarly, Plaintiffs' pilot expert, Mr. Edwards, acknowledged that receiving radar services and being instructed to enter the

traffic pattern at a specific point is not an instruction to a VFR aircraft to fly any particular route or altitude [247] and that during the accident flight Mr. Wojciechowicz could freely change course if he so desired.[248]

Given the irreconcilable conflict between the requirements of ¶ 5–5–9 of the Air Traffic Control Manual and the uncontested requirements for VFR pilots to see and avoid obstacles and unfavorable weather conditions, the Court accepts Mr. Henderson's testimony and concludes that these provisions did not apply to the air traffic controller's handling of N441AW's flight.

## CONCLUSIONS OF LAW

### Applicable Law

 The United States, as a sovereign, is immune from suit unless it waives its immunity by consenting to be sued. *See, United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Bolduc v. United States,* 402 F.3d 50, 55 (1st Cir. 2005) (United States immune except to extent it waives its immunity); *Dynamic Image Tech., Inc. v. United States,* 221 F.3d 34, 39 (1st Cir.2000) ("As a sovereign nation, the United States is immune from

243. Parham, Tr. 3/4/08 (PM), 67:18–68:4.

244. Parham, Tr. 4/4/08 (PM), 68:11–24.

245. Parham, Tr. 3/4/08, 105:25–106:4.

246. AIM, Joint Exhibit II, PDF p. 63; *Id.,* ¶ 3–2–6 f; Henderson, Tr. 3/11/08, 147:13–17. Mr. Parham's attempt to explain this provision away by testifying that "separation" is provided to VFR aircraft who are receiving radar services because a "safety alert" is "separation" was unpersuasive. The provisions in both the AIM and the Air Traffic Control Manual which describe the services

rendered under "basic radar services" do not mention "separation." ATC Manual, Joint Exhibit I, ¶ 7–6–1; AIM, Joint Exhibit II, ¶ 4–1–17 a; Parham, Tr. 3/4/08 (PM), 104:5–105:5. A "safety alert" is a warning, not an established separation criterion. Henderson, Tr. 3/11/08, 181:12–14.

247. Edwards, Tr. 3/3/08, 213:7–214:2.

248. Edwards, Tr. 3/3/08, 213:18–25, 255:6–10.

liability except to the extent that it consents to suit."); *Day v. Mass. Air Nat'l Guard,* 167 F.3d 678, 681 (1st Cir.1999) ("[a]s sovereign, the United States may not be sued for damages without its consent.") Limitations to the sovereign immunity of the United States such as the FTCA must be strictly construed and are not subject to waiver. *Patterson v. United States,* 451 F.3d 268, 270 (1st Cir.2006); *Dynamic Image Tech.,* 221 F.3d at 39.

■ The FTCA waives the sovereign immunity of the United States "in the same manner and to the same extent as a private individual under like circumstances." *See, Sosa v. Alvarez–Machain,* 542 U.S. 692, 700, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (FTCA designed to remove immunity from torts similar to private individuals); *Santoni v. Potter,* 369 F.3d 594, 602 (1st Cir.2004) ("[FTCA] provides a limited congressional waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment [similar to private parties in similar circumstances]"); *Roman v. Townsend,* 224 F.3d 24, 27 (1st Cir.2000) ("FTCA waives the sovereign immunity of the United States with respect to tort claims").

■ Further, suits brought under the FTCA are governed by the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). *See also, Bolduc v. United States,* 402 F.3d at 56 ("The phrase 'law of the place' refers to the law of the state in which the allegedly tortious acts or omissions occurred"); *Scanlon v. Dep't of the Army,* 277 F.3d 598, 600 (1st Cir.2002) ("Liability under the Federal Tort Claims Act is determined in accordance with the law of the place where the act or omission occurred."); *Santoni,* 369

F.3d at 603 ("Because the alleged tortious conduct took place in Maine, we look to Maine tort law in determining the defendant's liability under the FTCA.") The substantive law of the place where an accident takes place is used for ascertaining the authority to bring suit on behalf of others. *Wozniak v. United States,* 701 F.Supp. 259 (D.Mass.1988).

In the instant action, it is undisputed that the alleged acts and/or omissions of the defendant United States occurred in Puerto Rico. Therefore, Puerto Rico substantive law applies to the claims before us.[249]

■ Art. 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141 (1990), governs local tort liability in this jurisdiction. According to this provision, a person is liable for damages resulting from his/her negligent acts or omissions. In order to prevail, plaintiffs must establish: (1) a negligent act or omission, (2) damages, and (3) a causal relationship between them. *Irvine v. Murad Skin Research Lab., Inc.,* 194 F.3d 313, 321–22 (1st Cir.1999); *De–Jesus–Adorno v. Browning Ferris Indus. of P.R., Inc.,* 160 F.3d 839, 842 (1st Cir. 1998); *Marshall v. Perez Arzuaga,* 828 F.2d 845, 847 (1st Cir.1987); *Rivera v. Diaz,* 2005 TSPR 116; *Pons Anca v. Engebretson,* 160 D.P.R. 347 (2003); *Montalvo Feliciano v. Cruz,* 144 D.P.R. 748, 758 (1998); *Toro Aponte v. E.L.A.,* 142 D.P.R. 464, 473 (1997).

■ Plaintiff must prove that the conduct at issue was the factor which most probably caused the damages and the cause and effect relationship between both. *Soto Cabral v. E.L.A.,* 138 D.P.R. 298, 316 (1995). The mere fact that injuries or damages ensue is not grounds for liability

---

**249.** Indeed, the Parties stipulated that Puerto Rico law applies to the liability and damages determinations. PTO (docket No. 95) p. 9.

under art. 1802. Defendants will be liable only for those reasonably foreseeable consequences to their conduct. *De–Jesus–Adorno*, 160 F.3d at 842; *Rivera v. Diaz*, 2005 TSPR 116, 2005 WL 2149301 *4; *Pons Anca*, 160 D.P.R. at 355; *Montalvo Feliciano*, 144 D.P.R. at 755; *Toro–Aponte*, 142 D.P.R. at 473; *Ocasio Juarbe v. Eastern Airlines, Inc.*, 125 D.P.R. 410, 418 (1990) *Official translation reproduced in full in* 902 F.2d 117 (1st Cir.1990); *Jimenez v. Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982); *Pacheco v. A.F.F.*, 112 D.P.R. 296, 300 (1982).

 "Negligence has been defined by the Commonwealth courts as the failure to exercise due diligence to avoid foreseeable risks." *Malavé–Félix v. Volvo Car Corp.*, 946 F.2d 967, 971 (1st Cir.1991). Accordingly, a defendant will be found liable only in situations where the damages complained of were reasonably foreseeable. *De–Jesús–Adorno*, 160 F.3d at 842; *Montalvo–Feliciano*, 144 D.P.R. at 756; *Toro–Aponte*, 142 D.P.R. at 473; *Ocasio–Juarbe*, 125 D.P.R. at 418; *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 18 (1987). It has been held that a tortfeasor's duty of care is anticipating reasonably probable injuries to probable victims. *Marshall*, 828 F.2d at 847. *See*, Herminio M. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico* § 7.02[2] at 184–5 (2d ed.1986). However, the foreseeability required under art. 1802 does not extend to all imaginable effects resulting from defendant's conduct. This would be tantamount to turning the defendant into an absolute insurer of its acts and omissions. *See*, *Montalvo Feliciano*, 144 D.P.R. at 756; *Pacheco*, 112 D.P.R. at 300; *Jiménez*, 112 D.P.R. at 704.

 Further, this is a comparative negligence jurisdiction. Art. 1802 specifically provides that "concurrent imprudence of the party aggrieved does not exempt from liability, but entails reduction of the indemnity." Hence, the negligence of a plaintiff will not bar a tort-based claim but rather that the relief awarded shall be reduced proportionate to the degree of plaintiff's negligence. *Pons Anca*, 160 D.P.R. at 362.

## Air Traffic Controllers' Concurrent Duty

 Air traffic controllers owe pilots and passengers a duty of reasonable care. *Bieberle v. United States*, 255 F.Supp.2d 1190, 1201 (D.Kan.2003).[250] This duty of reasonable care is considered concurrent between Air Traffic Controllers and pilots. *In re N–500L Cases*, 691 F.2d 15, 33 (1st Cir.1982) (duty of ATC is concurrent with the pilot); *Webb v. United States*, 840 F.Supp. 1484, 1511 (D.Utah 1994).[251] Air traffic controllers' concurrent duty of care is defined by: 1) applicable FAA manuals and 2) a common law duty of reasonable care. *In re Greenwood Air Crash*, 924 F.Supp. 1518, 1536–39 (S.D.Ind. 1995). Under their common law duty, air traffic controllers are required to do what a reasonable air traffic controller of their experience and training would have done under the totality of the circumstances. *See, e.g., Worthington v. United States*, 807 F.Supp. 1545, 1567 (S.D.Ga.1992), *rev'd on other grounds* 21 F.3d 399 (11th Cir. 1994).

 "Whether or not required by the Manual or other regulations promulgated

**250.** See Order Denying the United States' Motion in Limine re the Caribbean National Forest filed on December 28, 2007 p. 4 (docket No. 87).

**251.** See Order Denying the United States' Motion in Limine re the Caribbean National Forest filed on December 28, 2007 p. 4 (docket No. 87) (ATC shares with pilots the responsibility for the safety of aircraft and their passengers).

by the Federal Aviation Administration, an air traffic controller is required to warn of dangers reasonably apparent to him." *Worthington,* 807 F.Supp. at 1567–68.

 Air traffic controllers must give warnings beyond the manuals when the danger is immediate or extreme. *Bieberle,* 255 F.Supp.2d at 1201.[252]

 Negligence by the pilot does not relieve air traffic controllers of their responsibilities and duty of care. *In re Greenwood Air Crash,* 924 F.Supp. at 1536. Thus, despite pilot negligence, the government may still be found liable for any breaches of their duty of care. *Bieberle,* 255 F.Supp.2d at 1205.[253]

### Standard of Care for Pilots and Controllers

In order to determine whether or not the acts or omissions of the Federal Aviation Agency ("FAA") personnel were a proximate cause of the accident, the Court must examine the relative responsibilities of pilots and controllers functioning in the National Airspace System.

 The FAA has promulgated regulations titled Federal Aviation Regulations (FARs), that govern, *inter alios,* the operation of airplanes by pilots. Title 14, Part 91 of the regulations constitute the "rules of the road" for pilots and have the force and effect of law. *In Re N–500L Cases,* 691 F.2d at 28; *New Hampshire Ins. Co. v. United States,* 641 F.Supp. 642, 650 (D.P.R.1986), *affirmed sub nom. Apostol v. United States,* 838 F.2d 595 (1st Cir.1988); *Srock v. United States,* 462 F.Supp.2d 812, 825 (E.D.Mich.2006). Their violation entails negligence *per se.*

*In re N–500L Cases,* 691 F.2d at 28; *New Hampshire Ins. Co.,* 641 F.Supp. at 650.

 The Aeronautical Information Manual ("AIM") is evidence of the standard of care among all pilots. *New Hampshire Ins. Co.,* 641 F.Supp. at 650; *Srock,* 462 F.Supp.2d at 825. The AIM provides pilots with basic flight information and the fundamental ATC procedures for use in the United States National Airspace System.[254] *Airplanes of Boca, Inc. v. United States,* 254 F.Supp.2d 1304, 1312 (S.D.Fla.2003). Pilots are charged with knowing the provisions of the AIM. *In re N–500L Cases,* 691 F.2d at 32; *accord* 14 C.F.R. § 61.105(a), (b)(3) (AIM required knowledge for pilot certification).

 The duties of pilots and air traffic controllers arise from shared assumptions, customs and patterns of conduct and these expectations arise from FAA rules and guidelines. *Cappello v. Duncan Aircraft Sales of Florida, Inc.,* 79 F.3d 1465, 1468 (6th Cir.1996). The duties of each in any given situation may depend on FAA orders, federal regulations and norms and customs of the air traffic control system. Sources may include the Air Traffic Control Manual (FAA Order 7110.65) and the AIM. *Bieberle,* 255 F.Supp.2d at 1201.

 Air traffic controllers can rely on the assumption that a pilot knows and will abide by the applicable FARs, as well as the information contained in the AIM. *Biles v. United States,* 848 F.2d 661, 663, n. 4 (5th Cir.1988); *Cappello,* 79 F.3d at 1468; *Hensley v. United States,* 728 F.Supp. 716, 722 (S.D.Fla.1989); *Cross-*

---

**252.** See Order Denying the United States' Motion in Limine re the Caribbean National Forest filed on December 28, 2007 p. 5 (docket No. 87).

**253.** See Order Denying the United States' Motion in Limine re the Caribbean National Forest filed on December 28, 2007 p. 4 (docket No. 87).

**254.** AIM, Joint Exh. II, PDF p. 63.

*man v. United States,* 378 F.Supp. 1312, 1318 (D.Or.1974).

## Pilot in Command Is the Final Authority

Federal regulations and case law clearly establish that the pilot in command has the primary and ultimate responsibility for the operation of his aircraft. Because of his training, first-hand knowledge of flight conditions and sole hands-on ability to maneuver the aircraft, the pilot in command is directly responsible for and has the final authority as to, the operation of that aircraft. 14 C.F.R. § 91.3; *Srock,* 462 F.Supp.2d at 825 ("Rule one [of the FARs] makes it clear that the pilot in command, like the ship captain, has the ultimate responsibility for the safety of his plane and his passengers and must comply with the extensive body of regulations published by the FAA." *quoting Cappello,* 79 F.3d at 1469); *Redhead v. United States,* 686 F.2d 178, 182 (3rd Cir.1982); *Black v. United States,* 441 F.2d 741, 744 (5th Cir. 1971); *Am. Airlines, Inc. v. United States,* 418 F.2d 180, 193 (5th Cir.1969).

Thus, the ultimate responsibility for the operation of the aircraft belongs to the pilot, not to air traffic controllers. 14 C.F.R. § 91.3; *Airplanes of Boca, Inc.,* 254 F.Supp.2d at 1314; *Redhead,* 686 F.2d at 182 (citing *In re Air Crash Disaster at New Orleans,* 544 F.2d 270 (6th Cir.1976)). The pilot has "final authority, even over air traffic controllers." *Airplanes of Boca, Inc.,* 254 F.Supp.2d at 1312, *quoting In re Air Crash Disaster at JFK Int'l Airport on June 24, 1975,* 635 F.2d 67, 74 (2nd Cir.1980).

The pilot in command of an aircraft "must be aware of those facts which are material to its proper operation and is charged with that which he should have known in the exercise of the highest degree of care." *Redhead,* 686 F.2d at 182 (citing *Am. Airlines,* 418 F.2d at 193). A

pilot has a duty to be aware of danger when he can perceive it with his own eyes, ears and instruments. *Airplanes of Boca, Inc.,* 254 F.Supp.2d at 1313; *In re Air Crash Disaster at JFK,* 635 F.2d at 74; *Pan Am. World Airways, Inc. v. Port Auth. of New York,* 787 F.Supp. 312, 318 (E.D.N.Y.1992), *rev'd on other grounds* against non-government defendant, 995 F.2d 5 (2nd Cir.1993). The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes. *Srock,* 462 F.Supp.2d at 826, *quoting Spaulding v. United States,* 455 F.2d 222, 227 (9th Cir.1972). A pilot is likewise charged with that knowledge which, in the exercise of due care, he or she should have known. *Redhead,* 686 F.2d at 182; *Black,* 441 F.2d at 743–44; *Associated Aviation Underwriters,* 462 F.Supp. 674, 681 (D.C.Tex.1978).

Pilots cannot ignore or disregard weather conditions which they see around them. *Airplanes of Boca, Inc.,* 254 F.Supp.2d at 1313, *citing Spaulding,* 455 F.2d at 227. The pilot is responsible for circumnavigating unfavorable weather conditions and this responsibility includes a duty to be aware of and evaluate conditions while in flight. *Id. See also, Srock,* 462 F.Supp.2d at 826 ("It is undisputed that VFR pilots are not to fly into clouds if they can be avoided" *quoting Pierce v. United States,* 718 F.2d 825, 829 (6th Cir. 1983)).

## Pilot Duties Under Visual Flight Rules

There are fundamental differences in the National Airspace System between pilot and air traffic control duties under IFR and VFR:

The flight of general aviation aircraft may be conducted under either one of two different sets of flight rules visual flight rules (VFR), or instrument flight rules (IFR). Under VFR, a pilot directs

his aircraft according to what he can see, navigating from place to place according to visual cues outside his aircraft. Under IFR, it is presumed that pilots are unable to see either other aircraft or the ground and are guided by air traffic controllers. A pilot flying under IFR must file an IFR flight plan, indicating his destination, proposed route of flight and requested altitude. Control of the aircraft is maintained by reference to various instruments on board, and navigation is accomplished through various electronic navigational aids, which receive and interpret data broadcast from ground stations.

*Redhead,* 686 F.2d at 180 n. 1.

■ VFR flight is limited to fair weather flying. The pilot under VFR flight rules is forbidden by federal regulations to fly through clouds or in areas of reduced visibility, and VFR pilots are not to fly into clouds if they can be avoided. 14 C.F.R. § 91.155; *Srock,* 462 F.Supp.2d at 825; *Cappello,* 79 F.3d at 1469.

■ "The case law is incontrovertible that an aircraft operating pursuant to visual flight rules must provide its own navigation and clearance from obstructions. The duty to operate the aircraft and to navigate, is assigned to the pilot who must provide his own separation from obstructions and other aircraft, while in VFR conditions." *Baker v. United States,* 417 F.Supp. 471, 484 (W.D.Wash.1975). The VFR pilot need not remain under the control or guidance of air traffic control but the pilot must maintain visual contact with the ground and obstructions. *Cappello,* 79 F.3d at 1469.

■ "A pilot operating in VFR conditions is authorized to fly fairly close to the ground and can often be below the elevation of nearby terrain." *Biles,* 848 F.2d at 663. An air traffic controller is entitled to assume that if a pilot is flying under VFR the weather conditions the pilot is experiencing are above VFR minima. *Id.*

■ "The ultimate responsibility for the safe operation of aircraft under visual flight rules rests with the pilot, regardless of air traffic clearance. Flight under visual flight rules, as compared to instrument flight rules, is guided by the overriding principle: "see and be seen" or "see and avoid." *Dyer v. United States,* 832 F.2d 1062, 1069 (9th Cir.1987).

■ The Government's provision of air traffic control services does not provide a basis for governmental liability simply because there has been an airplane accident, as the United States is not an insurer of safe flight. *United States v. S.A. Empresa de Viacao Area Rio Grandese (Varig Airlines),* 467 U.S. 797, 821, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) ("The FAA has a statutory duty to promote safety in air transportation, not to insure it.").

"Our nation's skies are crowded to an unprecedented extent, and air traffic controllers are exceedingly busy. Our complex air travel system will become unsafe unless pilots themselves carefully follow prescribed flight guidelines to achieve the maximum safety in their own operations." *Biles,* 848 F.2d at 663–64.

■ The failure to solicit a PIREP in a situation where weather conditions are variable and a VFR pilot is expected to avoid areas of adverse weather does not constitute negligence, since the pilot is presumed to be in a position to see and evaluate the weather and is in the best position to do so. *Redhead,* 686 F.2d at 183.

■ In some circumstances, an air traffic controller may be required to provide information not required by the Air Traffic Control Manual but only when the danger is immediate, extreme, or known

only to the controller or when the controller is in a better position to evaluate the situation and make more accurate observations than the pilot. *In re Greenwood Air Crash,* 873 F.Supp. 1257, 1264–65 (S.D.Ind. 1995); *Bieberle,* 255 F.Supp.2d at 1201. However, "[a] controller's duty to warn does not relieve the pilot of his primary duty and responsibility to be aware of danger when he can gather adequate information with his own eyes." *Srock,* 462 F.Supp.2d at 826, *quoting Schuler v. United States,* 868 F.2d 195, 198 (6th Cir.1989). But when a pilot's knowledge of the danger is demonstratively better than that of the controller, a pilot's failure to take action to eliminate the danger is the sole cause of any subsequent harm. *Bieberle,* 255 F.Supp.2d at 1205. Numerous other cases have come to the same conclusion. *See, e.g., Davis v. United States,* 824 F.2d 549, 554 (7th Cir.1987) (weather briefer's alleged negligence not cause of crash after VFR pilot saw conditions that he should have avoided but took no precautionary measures); *Redhead,* 686 F.2d at 183 (pilot in better position to see and evaluate weather in his vicinity); *Spaulding,* 455 F.2d at 226–27 (controller's duty to warn did not relieve pilot of responsibility not to disregard adverse weather conditions); *Biles,* 848 F.2d at 663 (no obligation for controller to warn pilot when controller had no reason to believe pilot was not in VFR conditions); *Black,* 441 F.2d at 745 (failure of briefer to warn of storm not causal after pilot discovered storm, appreciated the danger, and flew into it).

 In the case at bar, there has been no showing that the controller was aware that the pilot was about to fly into weather conditions which would not allow him to see and avoid terrain ahead or that the aircraft might be in unsafe proximity to terrain. Mr. Wojciechowicz gave no indication that he was approaching this type of weather or was unable to maintain a safe altitude nor did he seek assistance of any kind from the controller. Further, as previously discussed, the last full radar data block with a valid radar return displayed to Mr. Santiago on his radar by the San Juan (SJU) radar sensor was received from N441AW at 2:21:18 p.m., approximately one minute before the accident occurred, at approximately 4.7 miles from El Yunque. This location did not constitute cause to trigger an alert or to even turn on the St. Thomas (STT) sensor. The last "coast" data block on N441AW was seen at 2:21:42 p.m., approximately 45 seconds prior to the crash. Consequently, there was no information displayed on Mr. Santiago's radar scope showing either an actual or predicted position of the aircraft for 45 seconds before the accident and no terrain in the vicinity was ever depicted on the scope. Mr. Wojciechowicz was the *only* person with the ability to look ahead, determine the weather conditions and terrain elevations in his path and take appropriate action. The evidence at trial established that the pilot could see and appreciate the terrain merging with a cloud deck ahead of him for at least a minute before he flew into the clouds whereas the air traffic controller had no way of knowing of those circumstances. There simply was no information available to the controller at the time which would have given rise to a concurrent duty to assist the pilot in avoiding the accident. *See also, In re N–500L Cases,* 691 F.2d at 28–29 (although air traffic controllers may have responsibilities concurrent with those of the pilot, the pilot is solely responsible for safe operation of the aircraft when in a better position to appreciate hazards); *Beech Aircraft Corp.,* 51 F.3d 834, 840 (9th Cir.1995) ("While the duty in an airplane tort case is a concurrent one, resting on both air traffic controllers and pilots, 'under VFR conditions, ultimate responsibility for the safe operation of an aircraft rests with the pilot' "

*quoting Hamilton v. United States,* 497 F.2d 370, 374 (9th Cir.1974)).

*In re Greenwood Air Crash,* 873 F.Supp. 1257 (S.D.Ind.1995), frequently cited as a "concurrent duty" case, is distinguishable and does not support the conclusion that a concurrent duty existed under the facts of this case. *Greenwood* involved a mid-air collision where both aircraft were displayed on the controller's radar scope, the controller was aware of the proximity of the aircraft to each other, but the presence of the other aircraft was not known to the pilots. *Id.* at 1533–34. The case did not address the issue before us, that is, whether a pilot flying under VFR can shift to the controller the pilot's sole responsibility, when flying in visual meteorological conditions, to remain clear of unfavorable weather and to select an altitude that does not place the aircraft in unsafe proximity to terrain. Although the *Greenwood* court stated that a controller "must assist even careless pilots" it recognized that the duty exists "only in situations where the controller could have known that the aircraft was subject to dangerous conditions." *Id.* at 1265, *citing, Biles,* 848 F.2d at 664.

 Based on the evidence presented at trial, the Court concludes that the pilot of N441AW had superior information and knowledge regarding the pertinent weather and flight conditions during the accident flight because: (1) the pilot could—and did—alter the altitude of the aircraft without obtaining prior clearance from the controller to do so; (2) the pilot could—and did—alter the intended route of flight at any time during this flight without obtaining prior clearance from the controller to do so; (3) the pilot—and not the controller—had the best position to observe the actual terrain and its contours at any point along the flight; (4) the pilot—and not the controller—had the best position to observe the weather conditions as they affected the pilot's ability to see the terrain.

Plaintiffs in the matter before us have admitted that the crash occurred as a direct result of Mr. Wojciechowicz lacking "situational awareness" during the flight. The Court agrees. The record demonstrates that Mr. Wojciechowicz failed in his duty to himself and his passengers as pilot-in-command to pay due regard to the weather and terrain in his path. As a result, he flew N441AW into a cloud, within which the visibility was insufficient to allow him to avoid terrain in the aircraft's path.

Based on the evidence presented at trial the Court concludes that the pilot's actions were negligent as well as the sole proximate cause of the accident.

### Causation

 The Court further finds that, even assuming *arguendo* that a duty had been owed and breached by the controller—which the Court finds was not the case, plaintiffs have failed to prove that any such breach was the cause of the crash of N441AW, or that the pilot's actions in this case were foreseeable. A reasonable controller is entitled to assume, in the absence of evidence to the contrary, that the pilot, if for no reason other than self-preservation, will comply with the rules for VFR flying—remaining clear of clouds and keeping a sharp lookout for terrain and obstacles. *Biles,* 848 F.2d at 663, n. 4, *quoting Redhead,* 686 F.2d at 183. Thus, Mr. Santiago could not reasonably foresee that the pilot would violate FARs pertaining to minimum weather requirements and fly into a cloud while traversing rugged, rising terrain at low altitude and high speed. *See, Cappello,* 79 F.3d at 1468–70 citing *Redhead,* 686 F.2d at 183; *Biles,* 848 F.2d at 663 ("[A] pilot operating in VFR conditions is authorized to fly fairly close to the ground and can often be below the elevation of nearby terrain. [The air traffic controller] was entitled to assume that

if the pilot was flying according to VFR standards, visibility had probably improved"); *McDaniel v. United States*, 553 F.Supp. 910, 916 (D.C.Cal.1982) ("As a VFR pilot, Dr. McDaniel had no right, and could not reasonably expect, to rely on 'outside input' from the ATC to provide his separation from terrain ... [a]s a VFR pilot, Dr. McDaniel had a continuing duty to be aware of his location, of the elevation of the terrain over which he was flying, and of the danger posed by such terrain. He was negligent in not fulfilling these duties, and that negligence was the proximate and sole cause of this tragic plane crash.")

In the absence of a declaration of emergency or distress by the pilot of N441AW, the air traffic controller was entitled to assume that VFR weather conditions persisted, that the pilot could see the terrain and obstructions in the area through which he was flying and that the pilot would fulfill his duty to see and avoid terrain. Mr. Santiago had no reason to suspect that the pilot of N441AW would choose to fly into weather conditions that would preclude him from being able to see and avoid the terrain ahead. The negligent actions of the pilot in this case were not foreseeable and were the sole cause of this tragic accident.

Although the tragic ending of Mr. Wojciechowicz's flight from the Island of Culebra to San Juan is painful to contemplate, this Court finds there is no contravention of Air Traffic Controller Santiago's duties which could be classified as a contributory factor.

In this case, Mr. Wojciechowicz's negligent actions in flying into clouds that he could see touching the ground ahead of his aircraft, in an area of rising and rugged terrain, created a direct and unbroken causal relationship between the violation of the FARs and the crash of N441AW.

## CONCLUSION

Based on the foregoing, the claims asserted in these consolidated proceedings are hereby **DISMISSED.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.